717 A.2d 468

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Frederick THOMAS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1997.

Decided Aug. 18, 1998.

Reargument Denied Nov. 6, 1998.

Jay S. Gottlieb, Philadelphia, for F. Thomas.

Catherine Marshall, Andrew S. Gibson, Philadelphia, Robert A. Graci, Atty. General's Office, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

Frederick Thomas (Appellant) has filed a direct appeal[1] from the Judgment of Sentence of the Court of Common Pleas of Philadelphia County that sentenced him to death following his convictions for first degree murder[2] and possessing an instrument of crime.[3] We affirm the Judgment of Sentence.

### FACTS AND PROCEDURAL HISTORY

On December 24, 1993, the Philadelphia Police Department arrested Appellant and charged him with murder and related charges stemming from the shooting death of William Moyer (Victim), a driver for the Federal Express Company. The Honorable Juanita Kidd Stout was the presiding judge of a jury trial, which lasted from October 17 through 26, 1994. At the conclusion of the trial, the jury was unable to reach a unanimous verdict and the trial court declared a mistrial. A second jury trial commenced on February 15, 1995, and the

1. This Court has jurisdiction over direct appeals from judgments of sentence in cases in which the death penalty has been imposed. 42 Pa.C.S. § 9711(h).

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 907.

jury returned a verdict of guilty to charges of first degree murder and possessing an instrument of crime on February 27, 1995. The jury returned a sentence of death at the conclusion of the penalty phase. After denying Appellant's post-trial motions, the trial court formally imposed a death sentence for first degree murder and a suspended sentence for the charge of possessing an instrument of crime.

The evidence at trial established that on December 21, 1993, the Victim was delivering a package in the area of 3058 North 9th Street in Philadelphia. Two area residents, Willie Green (Green) and Charles Rowe (Rowe), were standing by a store on the corner of Ninth and Clearfield Streets close to the Federal Express truck. Green and Rowe, who had both known Appellant for several years, heard a loud bang and then saw Appellant run from behind the Federal Express truck and down an alley. They also saw Appellant tuck something under his jacket. When the two men walked over to the truck, they observed the Victim lying in the street, mortally wounded, his legs still moving.

Green and Rowe left the area because they did not want to get involved. Police arriving on the scene discovered the Victim's body lying face up with a large bullet hole to the left cheek. Based on the presence of gunpowder abrasions around the wound, the medical examiner, Adrienne Sekula–Perlman, M.D., determined that the killer fired the gun at close range, approximately twelve to eighteen inches away from the Victim's face. The gun was fired in an upward direction and the bullet went through the cheek into the base of the skull and entered the brain. Dr. Sekula–Perlman removed a large caliber bullet from the Victim's brain.

Police began looking for Green and Rowe because they had received information that the two men frequented the corner of Ninth and Clearfield Streets. After locating and interviewing them, the police obtained an arrest warrant for Appellant on December 23, 1993. Appellant surrendered himself to the police in the late evening hours of December 24, 1993.

At Appellant's second trial, the Commonwealth also called James Howser, à driver for the United Parcel Service (UPS), who testified that he delivered packages in the neighborhood where the murder occurred. Howser explained that on four or five occasions, he left his truck to make deliveries and returned to the truck to find Appellant sitting inside or on the truck's bumper.

Appellant testified at his trial and presented two alibi witnesses. He admitted that he had been at the intersection where the murder occurred, but claimed that he left the area an hour before the shooting. He stated that he went to the home of Carl Fooks (Fooks) and Odell Reid (Reid) and began drinking, and that the three men continued drinking from an hour before the shooting until approximately four hours after the murder. Fooks and Reid also testified that after Appellant arrived at Fooks' apartment, he did not leave until well after the killing.

At the penalty phase of the trial, the Commonwealth presented official court records showing that Appellant had been convicted of voluntary manslaughter in 1983, burglary in 1974, and aggravated robbery in 1969. Appellant introduced testimony from family members and a psychiatrist who testified that he had a drinking problem.

The jury found that the Commonwealth proved two aggravating factors: Appellant had a prior conviction for voluntary manslaughter, which is an aggravating factor pursuant to 42 Pa.C.S. § 9711(d)(12); and he had a significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9). The jury found no mitigating factors and sentenced Appellant to death.

## ISSUES

1. Was the verdict finding Appellant guilty of first-degree murder supported by the weight and sufficiency of the evidence?

2. Did the trial court err when it failed to strike the jury panel based on an allegation that the prosecution used

peremptory challenges selectively to exclude African Americans from the jury?

3. Did the trial court abuse its discretion by denying a continuance requested by defense counsel due to the unavailability of a witness?

4. Did the trial court abuse its discretion by allowing a Commonwealth witness, Mr. Howser, to testify about prior contacts with Appellant?

5. Did the court err in denying Appellant's requested charge concerning voluntary manslaughter as a possible degree of guilt?

6. Did the trial court err by refusing to give an alibi charge that told the jury that alibi evidence could create a reasonable doubt even if the alibi was "not wholly believed"?

7. Did the trial court commit reversible error in failing to charge the jury that third degree murder requires an intent to cause serious bodily injury that results in death?

8. Did the trial court err when it instructed the jury that life imprisonment means life imprisonment with no possibility of parole?

9. Did the trial court err by allowing the prosecutor to make prejudicial remarks to the jury during closing arguments?

## DISCUSSION

### I. Weight and Sufficiency of the Evidence

We first note that this Court is required to review the sufficiency of the evidence to sustain a conviction for first-degree murder in every case in which the death penalty has been imposed. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982). In his first claim, Appellant claims that the evidence was insufficient to sustain the verdict of first degree murder because two witnesses supported his alibi defense. He maintains that their testimony was credible and that the jury "could have and should have" believed them. Appellant's brief, p. 11. He also emphasizes that his trial testimony included his denial that he shot the victim.

■■■ When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998). Pennsylvania's murder statute provides, in pertinent part, as follows:

§ 2502 Murder.

(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

. . .

"Intentional killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S. § 2502. Thus, to sustain a conviction for first degree murder, the Commonwealth must prove that a human being was unlawfully killed; that the accused did the killing; that the killing was done with malice aforethought; and that the killing was willful, deliberate and premeditated. *Brown.* The willful, deliberate and premeditated intent to kill distinguishes first degree murder from all other degrees of murder. *Id.*

■■■ The Commonwealth can prove this specific intent to kill through circumstantial evidence. *Id.* Moreover, we have held that the use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, cert. denied, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995) (citing *Commonwealth v. Butler*, 446 Pa. 374, 378, 288 A.2d 800, 802 (1972); and *Commonwealth v. Meredith*, 490 Pa. 303, 311, 416 A.2d 481, 485 (1980)) ("If a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied").

We have no difficulty concluding that shooting another person through the cheek and into the skull and brain with a large caliber weapon establishes a willful, deliberate and premeditated intent to kill necessary to sustain a conviction for first degree murder. Moreover, we are not persuaded by Appellant's claim that his alibi evidence was more credible than the Commonwealth's evidence. It is well settled that determinations concerning the credibility of witnesses are the sole province of the jury. *Commonwealth v. Shaver*, 501 Pa. 167, 173, 460 A.2d 742, 745 (1983); *Commonwealth v. Brockington*, 500 Pa. 216, 219, 455 A.2d 627, 628 (1983); *Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976). The jury believed the Commonwealth's witnesses and rejected the testimony of Appellant and his two alibi witnesses, and we cannot and will not reevaluate the jury's credibility determinations.

Appellant also maintains that the verdict of guilty to the charge of first degree murder is against the weight of the evidence. This Court has stated that a new trial should be awarded only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1998). As stated previously, it was within the jury's province to believe the Commonwealth's witnesses and disbelieve the defense witnesses, and this verdict therefore does not shock our sense of justice. Accordingly, Appellant's challenges to the weight and sufficiency of the evidence do not warrant relief.

## II. *Batson Challenge*

Appellant next claims that the trial court erred when it failed to strike the jury panel because the prosecution selectively excluded African–Americans from the jury through the use of its peremptory challenges. Appellant argues that, during voir dire, the Commonwealth struck six prospective black veniremen, which, in itself, established a prohibited

634

pattern of racial exclusion from the jury in violation of the United States Supreme Court's mandate in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Batson* the Supreme Court addressed the issue of the limits placed on a state's use of peremptory challenges. While first reiterating that a prosecutor is ordinarily entitled to exercise peremptory challenges "for any reason at all," it also noted that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson* at 89, 106 S.Ct. 1712, (emphasis added). The Court in *Batson* established that a defendant could "establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. 1712.

■■■ This Court has articulated the showing necessary to establish a prima facie case of improper use of peremptory challenges. To do so, a defendant must establish that:

(1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can then rely on the fact that the use of peremptory challenges permits "those to discriminate who are a mind to discriminate"; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. The third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of the jurors acceptable to the Commonwealth who were stricken by the defense. After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race. If the trial court finds in the affirmative, it may then require the prosecutor to explain his or her reasons for

the challenge. Once the defendant makes a prima facie showing, the burden shifts to the Commonwealth to come forward with a neutral explanation for challenging black jurors.

*Commonwealth v. Simmons*, 541 Pa. 211, 231–32, 662 A.2d 621, 631 (1995), *cert. denied*, 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996) (citations omitted). In the instant matter a review of the record of the entire three-day jury selection process convinces us that Appellant has failed to establish prong three of the above-stated test and has, therefore, failed to make a prima facie showing of improper use by the prosecution of peremptory challenges.

Appellant first raised a *Batson* challenge to the prosecution's use of peremptory challenges on the first day of voir dire. Appellant objected to the Commonwealth's striking of three venirepersons, and he asked the Court to direct the prosecutor to state his reasons for the strikes on the record. (*See* Notes of Testimony (N.T.) 2/15/95, p. 77). The trial court rejected Appellant's *Batson* claim, noting that all but one of the individuals who had so far been questioned had been black.[4] The following day of jury selection the defense again objected to the prosecution's use of peremptory challenges. (N.T. 2/16/ 95, p. 133). Again, the court noted that nearly everyone in the courtroom was black and did not require the prosecution to state his reasons for the strikes on the record. *Id.* Clearly the trial court found that the "totality of the circumstances" did not indicate that the prosecutor was excluding jurors because of their race, and that the Appellant did not make out even a prima facie case of purposeful discrimination.[5]

Accordingly, since the law is clear that a prosecutor need not state the reasons for his use of peremptory challenges

4. We do note that the prosecution voluntarily provided race-neutral reasons for striking these three prospective jurors. (*See* N.T. 2/15/95, p. 78).

5. Appellant claims in his brief to this Court that the trial court ruled that a prima facie case of racial exclusion had been established. A review of the record reveals that this is simply not true.

until a defendant has established a prima facie case of discrimination, *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 1198, 140 L.Ed.2d 327 (1998), and as we find not even a whiff of improper use of peremptory challenges by the prosecutor, Appellant is entitled to no relief on this claim of purposeful discrimination in the jury selection process.

### III. *Denial of Continuance Request*

Appellant next claims that the trial court abused its discretion and prejudiced his right to a fair trial when it denied defense counsel's request to continue the trial based on the unavailability of a missing witness. According to Appellant, documents provided to the defense by the Commonwealth during discovery showed that a Maria Fielding gave a statement to the police that named someone other than him as the shooter.

The grant or denial of a continuance to secure a witness is a matter within the sound discretion of the trial court and an appellate court will not reverse a trial court's ruling unless there has been prejudice to the defendant or a showing of palpable and manifest abuse of discretion. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994). We consider the following factors when reviewing a trial court's decision to deny a request for a continuance:

(1) the necessity of the witness to strengthen the defendant's case;

(2) the essentiality of the witness to the defendant's defense;

(3) the diligence exercised to procure his or her presence at trial:

(4) the facts to which he or she could testify; and

(5) the likelihood that he or she could be produced in court if a continuance were granted.

*Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976).

The record demonstrates that the defense had been aware of Fielding since March of 1994, when it received discovery

from the Commonwealth. The defense subpoenaed her for Appellant's first trial in October of 1994, but she did not appear in court and the trial court issued a bench warrant for her. Fielding never testified at the first trial, but, after both parties rested in that trial, she did appear in court and then left without speaking to the attorneys. The bench warrant for Fielding remained outstanding. On February 13, 1995, eight days before the scheduled beginning of the second trial, defense counsel informed the court that his investigators were unable to find Fielding and he asked the trial court to direct the Commonwealth to attempt to locate her. The trial court issued a second bench warrant for Fielding and the Commonwealth agreed to look for her.

Trial commenced without either party locating Fielding. At the conclusion of the Commonwealth's case-in-chief, defense counsel informed the court that they had not found Fielding, and he requested the court admit into evidence her statement to the police. The trial court denied that request,[6] and the defense asked for a missing witness instruction, which the trial court also denied.

After reviewing the entire record, we conclude that the trial court did not abuse its discretion when it denied defense counsel's request for a continuance. The only time that defense counsel actually requested a continuance was on February 13, 1995, which still allowed the defense eight days before the start of trial to locate Fielding. We are satisfied that defense counsel was diligent in his attempts to secure Fielding's presence in court. Even if we assume that Fielding would have offered exculpatory testimony, it appears that Fielding was avoiding the police because she was wanted for

6. Appellant also attempts to argue that Fielding's hearsay statement to the police was admissible because she was unavailable to testify. However, prior statements of unavailable witnesses are only admissible if they bear an adequate "indicia of reliability", such as when the statement falls within a firmly rooted hearsay exception or is supported by a particularized guarantee of trustworthiness. *See Commonwealth v. Hanawalt,* 419 Pa.Super. 411, 416, 615 A.2d 432, 435 (1992). Because Fielding's statement did not meet this requirement, the trial court correctly held that it was not admissible.

638

welfare fraud. (*See* N.T. 2/13/95, pp. 3–11). Based on these facts, it is unlikely that granting the defense a continuance would have resulted in Fielding testifying at trial. In addition, we note that on November 30, 1995, when the trial court formally imposed the judgment of sentence, there was no indication that either the Commonwealth or the defense had succeeded in finding Fielding. Accordingly, we hold that Appellant has not established that the trial Court abused its discretion when it denied a request for a continuance.[7]

## IV. *Admissibility of UPS Driver's Testimony*

Appellant alleges that the trial court erred when it permitted the Commonwealth to introduce testimony from James Howser about his prior contacts with Appellant and the unauthorized entries of Appellant into Howser's UPS truck. This claim is without merit.

Evidence is relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995). The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. *Id.* at 174, 666 A.2d at 227. Evidence of prior bad acts committed by a defendant is not admissible if such evidence is offered merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995). However, evidence of a defendant's prior bad acts is admissible when it is likely to prove a common scheme, plan or design, malice, absence of mistake or accident, motive, or intent for the

7. Moreover, we reject Appellant's argument that he was denied his right to compulsory process. The right to compulsory process guarantees a procedure by which an accused can obtain witnesses in his or her favor, but does not guarantee testimony of any and all possible witnesses. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994). Appellant was not denied the subpoena powers of the Court, rather, his efforts to subpoena a witness were unsuccessful because the witness was avoiding law enforcement authorities. This situation does not constitute a denial of the Court's subpoena powers.

offense charged. *Id.* This type of evidence is also admissible when it tends to establish the identity of the person charged with the commission of the crime, or where it was part of the chain or sequence of events which formed the history of the case and formed part of the natural development of the facts. *Id.*

■ Howser's testimony established that Appellant had a propensity for making unauthorized entries into package delivery trucks when the drivers of the trucks stepped away from the trucks. This occurred in the same neighborhood where the driver of this Federal Express truck was murdered. We find this testimony relevant and admissible because it tended to establish the identity of the person who might have had a confrontation with the Victim as he stood at the side of his Federal Express delivery truck. When balancing the probative value of this evidence against any undue prejudice to Appellant in the context of this entire trial, we conclude that the trial court did not abuse its discretion when it permitted the Commonwealth to introduce this relatively brief testimony.

## V. *Denial of Request for Voluntary Manslaughter Charge*

Appellant's next argument is that the trial court erred when it denied a defense request to charge the jury that it could find him guilty of voluntary manslaughter as a possible degree of guilt. He claims that there was "overwhelming evidence" to warrant such a charge. The Crimes Code defines voluntary manslaughter as follows:

2503. Voluntary manslaughter

(a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

(b) Unreasonable belief killing justifiable.—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

(c) Grading.—Voluntary manslaughter is a felony of the second degree.

18 Pa.C.S. § 2503. Thus, the Crimes Code provides that a person is guilty of voluntary manslaughter if, at the time of the killing, he or she acted under a sudden and intense passion resulting from serious provocation by the victim. This Court has held that "sudden and intense passion," which is sometimes called "heat of passion," in the voluntary manslaughter statute includes emotions such as anger, rage, sudden resentment, or terror, which renders the mind incapable of reason. *Commonwealth v. Browdie*, 543 Pa. 337, 671 A.2d 668 (1996), citing *Commonwealth v. Harris*, 472 Pa. 406, 372 A.2d 757 (1977).

A trial court should only instruct on an offense where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict. *Browdie*. In *Browdie*, the defendant physically abused a ten-month-old baby for several months until he finally killed her. At the conclusion of the trial, defense counsel requested the trial court to charge the jury regarding "heat of passion" voluntary manslaughter. Although the Commonwealth agreed that the trial court should give such an instruction, the trial court refused because there was no evidence to support a theory that the killing was committed in the heat of passion. After a jury convicted him of third degree murder, Browdie asked this Court to grant him a new trial because the trial court did not instruct the jury that it could find him guilty of voluntary manslaughter. We rejected his arguments and held that the trial court was correct when it held that the defendant was not entitled to a voluntary manslaughter instruction because there was no evidence in the case to support such a verdict. This Court stated the following in *Browdie:*

[W]e hold that a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Therefore, only where an instruction is requested and only if the evidence supports "heat of passion" voluntary manslaughter, is an instruction thereon required.... Instructions regarding matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury.

*Id.* at 349–350, 671 A.2d at 674. Pursuant to our decision in *Browdie,* the trial court did not err when it denied Appellant's request for a voluntary manslaughter charge and we disagree with his claim that there was "overwhelming evidence" to prove voluntary manslaughter. To the contrary, there was no evidence presented that Appellant killed the Victim in a "sudden and intense passion." The Commonwealth's evidence established an intentional killing by firing a gun at close range through the Victim's cheek and upward into his brain. The defense evidence was intended to prove that Appellant was not the killer, and it did not include any evidence that would have supported a voluntary manslaughter charge. Because there was no evidence presented to support a charge of voluntary manslaughter, the trial court did not err when it refused Appellant's request for a jury instruction on that offense.

## VI. *Alleged Error in Alibi Instruction*

Appellant next claims that he is entitled to a new trial based on an alleged error in the trial court's instruction concerning alibi evidence. The trial court gave the following instruction concerning Appellant's alibi evidence:

I charge you now on alibi. Even though there is no burden whatsoever on the defendant to offer or prove a defense, the defendant has offered a defense of alibi. Alibi is a defense that places a defendant, at the relevant time, in a different place from the scene involved, and so removed therefrom as to render it impossible for him to be the guilty party.

Obviously the defendant cannot be guilty unless he was at the scene of the crime. The defendant has offered evidence to show that he was not present at the scene, but that he was at a relative's house in the vicinity at the time the crime was committed.

If you believe that testimony, obviously the defendant is not guilty, because the Commonwealth must prove, beyond a reasonable doubt, all of the elements of the crime and, in addition, it must prove, beyond a reasonable doubt, that the defendant was present and did, in fact, do the acts charged in the complaint.

The defendant's evidence that he was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt in your minds.

The credibility of the witnesses and the weight to be given their identification is exclusively for you, the jury.

Now, even though the defense has presented witnesses who testified as to alibi, you may choose to disbelieve or disregard the testimony concerning alibi, and you may accept as true the testimony that the defendant was present and did commit the crime. For the law states that a positive, unqualified identification by one witness is sufficient for conviction, even though other witnesses testified as to alibi.

N.T. 2/24/95 pp. 75–76. Appellant argues that the trial court's alibi instruction was incorrect because it did not tell the jury that an alibi defense could raise a reasonable doubt "even if not wholly believed." Appellant relies on this Court's decision in *Commonwealth v. Pounds*, 490 Pa. 621, 417 A.2d 597 (1980).

In *Pounds*, the defendant introduced alibi evidence through his own testimony and the trial court did not give the jury any instruction on alibi. This Court granted the defendant a new trial and stated that: "the trial court failed to instruct the jury that it should acquit if Pounds' alibi evidence, even if not wholly believed, raised a reasonable doubt of his presence at the scene of the crime at the time of its commission and, thus, of his guilt." 490 Pa. at 633, 417 A.2d at 603

(footnote omitted). However, in *Commonwealth v. Saunders*, 529 Pa. 140, 602 A.2d 816 (1992), the defendant argued that the trial court's alibi instruction was erroneous because the trial court did not include the words "even if not wholly believed" when explaining the jury's consideration of alibi evidence. Our decision in *Saunders* plainly held that these words were not necessary in an alibi instruction, and emphasized that an appellate court's inquiry into the adequacy of a jury charge must not focus on the presence of "magic words." In *Saunders*, as in the present case, the trial court closely patterned its alibi instruction after Pennsylvania Suggested Standard Criminal Jury Instruction § 3.11,[8] which does not contain the words "even if not wholly believed." The present case is squarely controlled by our *Saunders* decision and accordingly, this claim must fail.

## VII. *Third Degree Murder Instruction*

In yet another challenge to the trial court's jury instructions, Appellant alleges error in the trial court's definition of third degree murder. His specific argument is that the instruction was deficient because it did not tell the jury that third degree murder requires an intent to cause serious bodily injury that results in death.

To prove third degree murder, the Commonwealth must establish a malicious killing, but not a specific intent to kill. 18 Pa.C.S. § 2502(a), (c). Third degree murder requires malice, but contrary to Appellant's arguments, it does not

---

**8.** Pennsylvania Suggested Standard Criminal Instruction § 3.11 reads as follows:

Obviously the defendant cannot be guilty unless he was at the scene of the alleged crime. The defendant has (testified)(offered evidence) that he was not present at the scene but rather was at _____. You should consider this evidence along with all of the other evidence in the case in determining whether the Commonwealth has met its burden of proving beyond a reasonable doubt that a crime was committed and that the defendant himself committed (or took part in committing) it. The defendant's evidence that he was not present, either by itself or together with other evidence, may be sufficient to raise a reasonable doubt of his guilt in your minds. If you have a reasonable doubt of the defendant's guilt, you must find him not guilty.

require a specific intent to cause serious bodily injury. Accordingly, the trial court was not required to give such an instruction to the jury. What the trial court did give was a thorough instruction concerning the elements of first and third degree murder, which included the following:

So, you may find the defendant guilty of murder in the first degree, murder in the third degree or not guilty.

I shall define those crimes for you. First, whatever degree of murder, there is an element which we call malice. If there is no malice, there is no murder.

Malice consists of either an express intent to kill or an express intent to inflict great bodily harm or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty, which indicates an unjustified disregard for the likelihood of death or great bodily harm, and an extreme indifference to the value of human life.

Legal malice may be inferred and found from the attending circumstances of the act resulting in the death.

. . .

I charge you now on murder in the third degree. Murder in the third degree includes all unlawful killings under circumstances of depravity of heart, and a disposition of mind regardless of social duty, but where no intention to kill exists or can be reasonably or fully inferred.

Like murder in the first degree, malice must be found in order to constitute murder in the third degree. In murder in the third degree, however, there is no intent to kill, but the intent is only to do great bodily harm.

Therefore, in order to find the defendant guilty of murder in the third degree, you must find that the following elements have been established beyond a reasonable doubt: that the defendant caused the death of another person, and that the defendant acted with malice and with an intent to do great bodily harm but not to kill.

N.T. 2/24/95, pp. 62–65. This portion of the jury instruction demonstrates that the trial court did instruct the jury that the

definition of malice, which must be present for third degree murder, includes "an intent to do great bodily harm." Appellant's claim must therefore fail. Moreover, after reviewing the trial court's murder instruction in its entirety, we are satisfied that it clearly, adequately, and accurately provided the jury with the law on first and third degree murder. See *Commonwealth v. Chambers*, 546 Pa. 370, 382, 685 A.2d 96, 102 (1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997) ("trial court has broad discretion in phrasing jury instructions, and may choose its own wording as long as the law is clearly, adequately and accurately presented to the jury").

## VIII.  *"Life Means Life" Instruction*

Appellant next attempts to argue that he is entitled to a new trial based on the "failure of the court to charge the jury in the penalty phase that life imprisonment means life imprisonment without the possibility of parole." [9]  Brief for Appellant, p. 32.  This claim is frivolous.

In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), a plurality of the United States Supreme Court held that in cases in which a defendant's future dangerousness is at issue and the defense makes a specific request for such an instruction, it is a denial of due process if the trial court refuses to instruct the jury what the term "life sentence" means.  This Court adopted *Simmons* as the law of this Commonwealth in *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995), *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995), and we recently extended *Simmons* to situations in which defense counsel brings up the issue of future dangerousness or possibility of parole. *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998).  In

---

9.  In a related issue in this section of Thomas' brief, he claims that the trial court erred when it did not "life qualify" the jury by asking potential jurors if they could impose a life sentence in an appropriate case.  See *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037 (1996) (in which this Court explained the process of life qualifying jurors). This issue has no merit because the record shows that Thomas' trial counsel, who continues to represent him in this appeal, life qualified the jury.

*Clark,* defense counsel raised the possibility of a prisoner sentenced to life in prison having his or her sentence commuted and being released from prison. This Court held that a trial court must instruct the jury on the law as it relates to the possibility of parole when that issue plainly arises from the arguments of either counsel in the penalty phase.

Here, as in *Clark,* defense counsel first raised the question of the meaning of a life sentence during his closing argument in the penalty phase of the trial, when he stated the following:

[I]n Pennsylvania it is the law, and the Justice will so charge you, that life imprisonment means exactly that, life imprisonment. It is not parolable, he cannot get out of prison.

N.T./ 2/24/95, p. 54. Later during her final charge to the jury, the trial court stated the following:

During his argument [Defense Counsel] spoke of the Pennsylvania law regarding life imprisonment, I shall read that to you.

Under Pennsylvania law, a sentence of life imprisonment is not subject to parole. A person becomes eligible for parole only after serving his or her minimum sentence. A sentence of life imprisonment has no minimum, therefore a life prisoner never becomes eligible for parole.

With some regularity, however, life prisoners petition the Board of Pardons seeking commutation, asking the Governor to set a minimum term for years on their life sentence.

While such commutations are generally rare, if a majority of the Board of Pardons recommends a commutation to the Governor and the Governor agrees with the recommendations, and commutes a life sentence to a minimum sentence of a specified number of years and a maximum sentence of life imprisonment, the life prisoner would become eligible for parole upon the expiration of the specified minimum period.

*Id.* at 61–62. Defense counsel did not object to this instruction.

■ This case is distinctly distinguishable from *Simmons* because the trial court actually gave a jury instruction concerning the meaning of the term "life sentence." After reviewing this instruction, we are satisfied that it was an accurate statement of the law and that it did not violate Appellant's due process rights. In addition, we note that this instruction is similar to the one we recently approved in *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (1998) (it was not error for the trial court to instruct the jury that a life sentence could be commuted or the governor could pardon the defendant). This Court finds the instruction to be acceptable because it essentially informed the jury that "life means life" unless a governor grants a commutation, which is rare. Accordingly, no relief is due.

## IX. *Alleged Prosecutorial Misconduct*

Appellant's final argument is that the prosecutor committed misconduct during his closing arguments in the guilt and penalty phases of trial. This Court recently reiterated the well settled standard for reviewing allegations of improper argument by a prosecutor in *Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313 (1997), in which we stated the following:

> The standard for reviewing such claims is well settled. Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. Moreover, the prosecution, similar to the defense, is accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury. The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that can be drawn therefrom. Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel.

*Id.* at 380, 706 A.2d at 330. After reviewing each allegation of prosecutorial misconduct alleged by Appellant, we are satisfied that no relief is due.

Appellant first alleges that he is entitled to a new trial because the prosecutor referred to frogs and scorpions in his closing argument. He does not explain how this reference prejudiced him, but seems to suggest that the mere reference to these animals requires reversal. The challenged portion of the prosecutor's argument is as follows:

> Out of the defendant's own mouth, he tells you, "I started drinking a day before." Okay. What does that mean? Does it mean a force of habit, that when he gets a load on or when he drinks he has an affinity for delivery vans? You could conclude that.

> For an old childhood tale that some old wives used to tell, they used to tell about the frog and the scorpion swimming across the lake. The scorpion hitched a ride on the frog's back, and they swim out into the middle of the lake, and all of a sudden the scorpion stings the frog. The frog asked him, said, "Man, why did you sting me, you will kill us both? Now we're both going to drown." The scorpion said, "I guess it was just a force of habit."

> A force of habit, is that what we're talking about here? When Mr. Thomas has a few drinks, he likes to get into vans. . . .

N.T. 2/24/95, pp. 41–42. After reviewing the prosecutor's references to the scorpion and frog in context of this illustrative tale, we conclude that this argument was proper and within the limits of permissible oratorical flair.

Appellant also complains that the prosecutor referred in his closing argument to "the innocence of life" and the "badlands." However, Appellant has again failed to explain why these words were improper and how their use prejudiced him. After reviewing the challenged portions of the closing argument in context, we have no difficulty concluding that these remarks were not improper and do not require reversal.

Indeed, the record demonstrates that it was defense counsel who first referred to the badlands in his closing argument.

Appellant's next complaint is that the prosecutor's closing argument referred to "blessings and curses" and "drinking establishments in Arizona", however, Appellant has again failed to present any meaningful argument concerning how or why these words deprived him of a fair trial. The prosecutor used these terms while he was arguing that Rowe's testimony was credible, stating the following:

> Mr. Rowe, and pity or sympathy has no play in this, you saw him sit up here, but what did he say? I couldn't read, and I'll tell you I can't read, but after I heard the bang, the only person I saw running from the area was Fred Thomas.
>
> Isn't it a note of irony, ladies and gentlemen, that Dr. Adrienne Perlman, with all of her education and all of her expertise, corroborates what the illiterate Mr. Rowe said? Mr. Rowe said—he didn't use "spasmatic," he said, "I saw his feet kicking." Doctor, is that consistent with the type of injury suffered by Mr. Moyer? Oh, yes, that would be involuntary movement.
>
> You know, *pride is a blessing and a curse.* You saw him sit there and struggle with admitting to you what every six, seven or eight year old can do, me at 45, I can't do: I can't read. I can sign my name, I can read a few numbers, but I submit to you, ladies and gentlemen, *a sign that I saw in an old drinking establishment where the stage coach used to pass out in Arizona,* it went something like this: "not drunk is he who from the floor can rise up and still drink more, but drunk is he who [prostrate] lies without the power to drink or rise."

N.T. 2/24/95, p. 46 (emphasis added). We find the challenged arguments to be innocuous, proper, and within the limits of permissible oratorical flair.

Appellant's other allegations of prosecutorial misconduct are similarly undeveloped and vague. In his brief, Appellant's attorney "strongly urges this Court to thoroughly review the closing remarks of the District Attorney." Brief for Appellant, p. 33. His brief contains a recitation of the standard for

reviewing allegations of prosecutorial misconduct, followed by a single paragraph containing a list of words and phrases that Thomas challenges as improper. The brief includes citations to pages in the notes of testimony, but no specific arguments concerning reasons why each challenged portion of the argument deprived Appellant of his right to a fair trial. We caution counsel that this type of cursory legal discussion is woefully inadequate. This Court encountered a similar situation *LaCava*, in which we stated the following:

> Appellant next cites to 21 pages of the record to show that the prosecutor improperly commented on appellant's credibility on numerous occasions during his cross-examination. Appellant fails, however, to specifically identify the alleged prejudicial comments because "in the interest of judicial economy," such references would be "too numerous" to list. He neither explains with any particularity why the unidentified comments or statements specifically caused him undue prejudice nor reveals why any particular statement was supposedly improper. This Court will not make appellant's arguments for him. Pa.R.A.P. 2119(a). *See also Commonwealth v. Jackson*, 494 Pa. 457, 459, 431 A.2d 944, 945 (1981) (the failure of petitioner's argument in his brief to separately address each claim presented waived consideration of claim). Accordingly, absent even a meager attempt to show how these statements deprived him of a fair trial or worked to form in the jury's minds a fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict, no relief is due. *See Holloway*, supra, 524 Pa. at 353, 572 A.2d at 693.

*Id.* at 188, 666 A.2d at 234–235. Because the legal discussion in Thomas' brief concerning these allegations of improper argument is insufficient, we will not discuss each allegation of misconduct at length. Nevertheless, we have reviewed the entire record and we hold that none of the challenged portions of the prosecutor's closing arguments had the unavoidable effect of prejudicing the jury, forming in their minds fixed bias and hostility towards the accused that would prevent them from properly weighing the evidence and rendering a true verdict. Accordingly, no relief is due.

*Statutory Review*

Having addressed each of Appellant's claims, we must also conduct the review mandated by 42 Pa.C.S. § 9711. Section 9711 requires this Court to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[10]

Our review of the record reveals that Appellant's death sentence was not the product of passion, prejudice or any other arbitrary factor and that there was sufficient evidence to support the two aggravating circumstances found by the jury. We have also conducted an independent review of the sentencing data compiled by the Administrative Office of Pennsylvania Courts. Considering both the circumstances of the crime and the character and record of the Appellant, we find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

## CONCLUSION

For the foregoing reasons, we affirm the Judgment of Sentence. We direct the Prothonotary to transmit the record in this case to the Governor of Pennsylvania forthwith.

NIGRO, J., concurs in the result.

10. Effective June 25, 1997, the General Assembly repealed proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and a portion of subsection (h)(4) that references proportionality review. Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. However, because Appellant's death sentence was imposed before the effective date of the act, he is entitled to proportionality review. *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997)