J-S11029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
CECIL HOWARD FOREMAN :
:
Appellant : No. 595 WDA 2024

Appeal from the Judgment of Sentence Entered April 25, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007400-2022

BEFORE: MURRAY, J., KING, J., and LANE, J.

MEMORANDUM BY KING, J.: **FILED: June 20, 2025**

Appellant, Cecil Howard Foreman, appeals from the judgment of sentence entered in the Allegheny County Court of Common Pleas, following his jury trial conviction for third-degree murder, and bench trial conviction for persons not to possess firearms.[1]  We affirm.

The relevant facts and procedural history of this matter are as follows. Early on September 12, 2021, Shauna Kelley attended a concert at Club 24 in Pittsburgh, Pennsylvania.  Maleeta Irvin was also in attendance, along with her boyfriend, Appellant.  Ms. Kelley and Appellant had known each other for over 35 years, and Ms. Kelley and Ms. Irvin were best friends.

At the club, Ms. Kelley noticed Appellant talking to another woman and accused him of cheating on Ms. Irvin.  Appellant became angry and argued

_____

[1] 18 Pa.C.S.A. §§ 2502(c) and 6105, respectively.

with Ms. Kelley, calling her names, tapping her repeatedly on the forehead, and demanding that she mind her own business. Ms. Kelley eventually left the club, returning to her residence in Prospect Terrace, where Ms. Irvin was her neighbor. Around 1:45 or 2:00 a.m., Ms. Kelley went to Ms. Irvin's residence, where the two women argued about what had happened at the club. Appellant subsequently returned to the residence and joined the argument.

Around 2:20 a.m., Ms. Kelley's son, Michael Kelley, came to Ms. Irvin's residence to confront Appellant about putting his hands on Ms. Kelley. The two men exchanged words and Ms. Kelley heard Mr. Kelley say that Appellant had punched him.[2] Mr. Kelley left the scene and returned; during this time, some of Mr. Kelley's friends were occasionally visible on the door camera video. (*See* Commonwealth's Ex. 2 at 0:59 to 1:15). Appellant left and returned a second time around 3:30 a.m. (*Id.* at 2:03). At 3:31 a.m., Ms. Irvin called 911 regarding the confrontation.

Around 3:34 a.m., there was another confrontation between Mr. Kelley and Appellant. (*Id.* at 8:20 to 8:25). Around 3:40 a.m., Appellant went inside the house and came outside again. (*Id.* at 7:00 to 7:01). Mr. Kelley returned to the Irvin residence around approximately 3:49 a.m. (*Id.* at 02:25 to 9:03).

At 3:51 a.m., Ms. Irvin, Ms. Kelley, Mr. Kelley and Appellant stood on

_____

[2] Although there is door camera footage of some of the events at issue, this interaction was not captured on video, which starts at approximately 3:26 a.m. (*See* Commonwealth's Ex. 2).

the front stoop of Ms. Irvin's house while Mr. Kelley and Appellant continued to exchange words. (*Id.* at 10:07). At this time, Mr. Kelley was visibly unarmed, with both hands empty. (*Id.*) Ms. Irvin attempted to push Appellant back into the house while Mr. Kelley continued to speak to him. (*Id.*). It appeared that Mr. Kelley began to turn away to leave. (*Id.* at 10:07 to 10:22).

At this time, Appellant exited the residence holding a firearm. (*Id.* at 10:22 to 10:23). Appellant pointed the gun at Mr. Kelley, who began to flee; Ms. Kelley jumped in front of Mr. Kelley, and Appellant fired. (*Id.*) Appellant shot Mr. Kelley four times in the neck, trunk, finger, and shoulder. Ms. Kelley was shot in the abdomen and thigh. Ms. Kelley fell to the ground by the front steps, and Mr. Kelley ran towards a car parked in the street. (*Id.* at 10:23 to 10:28). Appellant approached Ms. Kelley, stood over her, pointed the gun at her head and "clicked" it, but the gun was out of bullets. (*Id.* at 10:29). He then fled in his own vehicle. (*Id.* at 3:53). Ms. Kelley's daughter placed another 911 call.

Police and emergency services arrived on the scene, where they found Mr. Kelley lying on the street with a bystander performing CPR, and Ms. Kelley lying where she had fallen. Mr. Kelley was pronounced dead at the scene, and Ms. Kelley was transported to the hospital. Subsequently, Appellant was arrested and charged with homicide, attempted homicide, and persons not to possess a firearm.

Prior to trial, Appellant sought a jury instruction on voluntary

manslaughter both as unreasonable belief/imperfect self-defense and heat of passion. At trial, Appellant testified in his own defense. Appellant testified that he had known Ms. Kelley and her family for many years, and that he also knew Mr. Kelley as "30 Shot Mikey" or "30," both of which were Mr. Kelley's rap pseudonyms. Appellant also testified that he knew Mr. Kelley to carry firearms.

Appellant stated that on the night of the shooting, following his arguments with Ms. Kelley and Mr. Kelley, Mr. Kelley and four of his friends jumped him, knocked him to the ground, and began to punch and kick him, cut his nose, and ripped off his gold chain. Appellant further claimed that Mr. Kelley stated, "Man, I'm going to kill you," or "Beeve, I'm going to kill you." (N.T. Trial, 2/1/24, at 404). According to Appellant, "Beeve" was a young man from the neighborhood who had passed away, and Appellant interpreted this as "swearing on somebody," or in other words, that Mr. Kelley was serious about his threats. (*Id.*) Appellant also stated that Mr. Kelley relentlessly threatened to kill him and told Appellant that his car was not "going to make it off that hill." (*Id.* at 411). Appellant stated that after this threat, he grabbed his firearm because he "wanted to live." (*Id.* at 412).

Following Appellant's testimony, Appellant requested that the trial court charge the jury on voluntary manslaughter—heat of passion. The trial court denied the request.

Ultimately, on February 2, 2024, the jury acquitted Appellant of first-degree murder and attempted homicide and convicted him of third-degree

murder. The court convicted Appellant of persons not to possess firearms. On April 25, 2024, the court sentenced Appellant to an aggregate 17 to 35 years' incarceration. Appellant did not file a post-sentence motion.

On May 20, 2024, Appellant timely filed a notice of appeal. On May 28, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On July 19, 2024, following an extension, Appellant timely complied.

Appellant raises the following issue for our review:

> Were there sufficient facts of record warranting the jury to be instructed on Voluntary Manslaughter—Heat of Passion, and, by declining that instruction, did the trial court usurp the jury's fact-finding role and impermissibly impinge upon that and Appellant's right to argue, in the alternative, Voluntary Manslaughter—Heat of Passion, all in violation of the Sixth Amendment right to a fair jury trial, as well as the corresponding right under Article I, § 9 of the Pennsylvania Constitution?

(Appellant's Brief at 4).

Appellant argues that the trial court erred by failing to instruct the jury on voluntary manslaughter—heat of passion. According to Appellant, during the altercations with Mr. Kelley and Ms. Kelley, he felt rage, anger, and fear for his life. Appellant asserts that he had no time to cool off or regroup. Appellant contends that it was for the jury to decide whether the cumulative impact of such events qualified as "serious provocation" under the law. Appellant insists the court usurps the jury's role as factfinder to determine whether circumstances constituted "heat of passion." Appellant concludes that the court's error deprived him of his Sixth Amendment right to a fair trial,

- 5 -

and requires this Court to grant him a new trial. We disagree.

Our standard of review of a court's decision to include or omit jury instructions "is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Baker*, 24 A.3d 1006, 1022 (Pa.Super. 2011), *aff'd*, 621 Pa. 401, 78 A.3d 1044 (2013) (quoting *Commonwealth v. Galvin*, 603 Pa. 625, 651, 985 A.2d 783, 799 (2009), *cert. denied*, 559 U.S. 1051, 130 S.Ct. 2345, 176 L.Ed.2d 565 (2010)). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Commonwealth v. Hamilton*, 766 A.2d 874, 878 (Pa.Super. 2001).

> In evaluating jury instructions, we must read the charge as a whole to determine whether it was fair or prejudicial. *Commonwealth v. Murphy*, 559 Pa. 71, 739 A.2d 141, 146 (1999). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273, 1274 (1990). For appellant to be entitled to a new trial, the jury instruction must have been fundamentally in error, or misled or confused the jury. *Commonwealth v. Patosky*, [656 A.2d 499, 506 (Pa.Super. 1995), *appeal denied*, 542 Pa. 664, 668 A.2d 1128 (1995)].

*Commonwealth v. Wright*, 599 Pa. 270, 315, 961 A.2d 119, 145 (2008).

The Crimes Code defines voluntary manslaughter, in relevant part, as follows:

**§ 2503. Voluntary manslaughter**

**(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed ….

\* \* \*

**(b) Unreasonable belief killing justifiable.**—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(a)(1). "[T]o prove voluntary manslaughter, there must be 'sufficient cause of provocation and a state of rage or passion, without time to cool, placing the [defendant] beyond the control of his reason and impelling him to the deed.'" **Commonwealth v. Swaney**, 445 Pa. 244, 246-48, 284 A.2d 732, 733 (1971) (quoting **Commonwealth v. Brown**, 436 Pa. 423, 427, 260 A.2d 742, 744 (1970)).

The Pennsylvania Supreme Court has repeatedly held "that a murder defendant is entitled to a jury instruction on the lesser offense of voluntary manslaughter only where there is sufficient evidence to support such a verdict." **Commonwealth v. Cook**, 597 Pa. 572, 633, 952 A.2d 594, 636-37 (2008) (citing **Commonwealth v. Ragan**, 560 Pa. 106, 743 A.2d 390 (1999)).

> [U]nder Pennsylvania law, a homicide defendant is entitled to a jury instruction on voluntary manslaughter only "where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict."

- 7 -

> ***Commonwealth v. Thomas***, 552 Pa. 621, 717 A.2d 468,
> 478 (1998)[, *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145
> L.Ed.2d 66 (1999)]. Voluntary manslaughter is an
> appropriate verdict for "heat of passion" killings, where, "at
> the time of the killing, [the defendant] acted under sudden
> and intense passion [due to] serious provocation by the
> victim." ***Id.*** at [640, 717 A.2d at] 477. The test for
> provocation is "whether a reasonable [person] confronted
> by the same series of events, would become impassioned to
> the extent that his mind would be incapable of cool
> reflection." ***Commonwealth v. Galloway***, [485 A.2d 776,
> 783 (Pa.Super. 1984)].

***Commonwealth v. Kim***, 888 A.2d 847, 852-53 (Pa.Super. 2005), *appeal*

*denied*, 587 Pa. 721, 899 A.2d 1122 (2006).

Instantly, at the close of the Commonwealth's case-in-chief, the court

heard argument regarding Appellant's requested jury instructions and stated:

> As to first degree murder, of course. Third degree murder.
> I will give voluntary manslaughter, unreasonable belief.
> Instruct on self-defense. I am not going to give—I am
> giving unreasonable belief as fact of voluntary
> manslaughter, not the qualifications as to that. The [c]ourt
> finds as a matter of law, facts and circumstances that
> characterize that prong of voluntary manslaughter has not
> been met with ample evidence of a fight. Fight is de-
> characterized, that is the defendant being jumped. There is
> no indications of serious or significant injuries at all. He
> himself thought it was over and that it calmed down. So I
> am not going to give that prong [regarding heat of passion].

(N.T. Trial, 2/1/24, at 461-62). Appellant's counsel argued that the court was

usurping the jury's role as the factfinder and contended that the court should

allow the jurors to determine whether they believed Appellant's claims

regarding his state of mind. (***See id.*** at 462-63). The court responded:

> All right. What he has told the jury over and over is that he
> is scared for his life by virtue of the threats that Michael
> Kelley and his associates may impose. Again, I think it

- 8 -

would confuse the jury rather than set forth a theory of non-culpability that has a substantial and significant basis in the record to give.

(*Id.* at 461-62).

In its opinion, the trial court further explained its decision to deny Appellant's request for a "heat of passion" jury instruction and instruct only on unreasonable belief as follows:

> The [court] heard argument at the close of trial regarding the parties['] proposed jury instructions. In addition to other proposed instructions, Appellant requested instruction on both prongs of voluntary manslaughter. The [c]ourt, after taking the evidence[,] indicated it would instruct the jury on unreasonable belief voluntary manslaughter, but not heat of passion voluntary manslaughter.
>
> Here, the [c]ourt opted to give the voluntary manslaughter instruction in relation to unreasonable belief only and not heat of passion voluntary manslaughter, as there had been ample evidence of a "cooling off" period prior to the murder which as a matter of law negated the applicability of that instruction.

(Trial Court Opinion, 7/31/24, at 8-9) (internal citations omitted). We agree with the trial court that the evidence of record did not support a "heat of passion" instruction.

While Appellant and Ms. Irvin claimed that he had been jumped by Mr. Kelley and his friends, the video evidence and other testimony contradicted that claim. Ms. Kelley testified that Mr. Kelley did not threaten Appellant, and that Mr. Kelley's friends did not harm Appellant. In fact, video evidence did not show any of Mr. Kelley's friends present at the time the shooting occurred. Further, while Appellant claimed that Mr. Kelley repeatedly threatened his life

and he was frightened, Appellant went **into** the house immediately prior to the shooting: he could have stayed there, locked the door, and called for help. Instead, Appellant returned outside with a gun. Finally, Appellant does not dispute that the evidence established that Appellant shot Mr. Kelley in the back as he was running away. Appellant does not explain why he could not have simply left the scene when Mr. Kelley fled, rather than emptying the entire clip of his firearm into his victims and then pointing the gun at Ms. Kelley's head.

Essentially, Appellant presented his own and Ms. Irvin's testimony that he had been "jumped" and threatened to support his argument that he was entitled to his requested instruction. However, other evidence contradicted this claim and demonstrated that Appellant had the time to safely retreat and "cool down," but chose, instead, to return with a firearm. **See Cook, supra**; **Kim, supra**. On this record, we see no reason to disrupt the trial court's decision to deny the requested jury instruction where the evidence would not reasonably support such a verdict. **See Baker, supra**. Further, Appellant has failed to explain how the trial court's decision violated his Sixth Amendment right to a fair trial where the law requires a "heat of passion" instruction **only** where the evidence could reasonably support such a verdict. **See Thomas, supra**. As discussed above, the evidence did not support such a verdict. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/20/2025