J. S15036/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                              :        PENNSYLVANIA
                         v.   :
                              :
ALANAH F.F. PETERS,           :        No. 2176 EDA 2015
                              :
            Appellant         :


Appeal from the Judgment of Sentence, June 2, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0001270-2012


BEFORE:  BOWES, J., DUBOW, J. AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED JANUARY 30, 2018**

Alanah F.F. Peters appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted her of attempted murder, aggravated assault, robbery, conspiracy to commit murder, possession of an instrument of crime, recklessly endangering another person, firearms not to be carried without a license, and carrying firearms on public streets or public property in Philadelphia.[1]  The trial court imposed an aggregate sentence of 13 to 30 years of imprisonment.  We affirm.

The trial court set forth the following factual history gleaned from appellant's jury trial:

---

[1] 18 Pa.C.S.A. §§ 901(a), 2702(a), 3701(a)(1)(ii), 903, 907(a), 2705, 6106(a)(1), and 6108, respectively.

[The] events began on August 17, 2011, when uniformed Philadelphia Police Lieutenant Steffan Gallagher responded to a radio call for a person screaming at an apartment building located at 8836 Cottage Street in Northeast Philadelphia, Pennsylvania. Upon arriving at this second floor of the reported address, Lieutenant Gallagher saw the victim, Jesse Hicks, suffering from a gunshot wound to his face and other critical injuries alone inside the bedroom of this apartment. Mr. Hicks was bleeding profusely from his face and chest and wearing only a sleeveless T-shirt and underwear. Mr. Hicks immediately informed Lieutenant Gallagher that he had been brutally beaten, shot in the mouth and robbed by two men of his cash and clothes inside his bedroom after his girlfriend, [appellant], had permitted the perpetrators to enter his single bedroom apartment. Lieutenant Gallagher testified that he had observed the bedroom where he had found the victim to be in complete disarray. He observed broken furniture including an open safe and blood covered papers strewn across the floor. Lieutenant Gallagher estimated that the distance from [the] victim's bedroom was 15 feet to the single apartment entrance located on the second floor of the building.

Lieutenant Gallagher further stated that he had observed [appellant] standing near the downstairs apartment or outside the building upon his arrival. At the scene, Lieutenant Gallagher eventually convinced Mr. Hicks to seek emergency treatment for his gunshot wounds, other injuries and heart disease related difficulties and transported him to Aria Torresdale Hospital. During his initial investigation at the scene, Mr. Hicks informed the responding police officers that two males knocked on the door of the property, and were let in by [appellant]. Mr. Hicks further communicated his belief to law enforcement during the transportation to the hospital that he was set up to be robbed and shot by [appellant, his girlfriend].

Mr. Hicks explained that he and [appellant] had been arguing over money and her amorous activities with other men. He said that he had been upset because [appellant] continued to whisper or text on her cellphone through the night with other men as they argued. He said that shortly after [appellant's] suspicious telephone conversations, there was a knock at the apartment door. He told the officer that [appellant] let the two males into the apartment, who threatened, beat, shot and robbed him while [appellant] stood near and directed the men to check his pockets as they rifled through his belongings, shot him in the mouth and stripped him of his pants. [Appellant's] three year old son was present in the apartment during this violent episode.

Jesse Hicks's trial testimony corroborated and supplemented Lieutenant Gallagher's accounts to the jury of that fateful evening. Mr. Hicks credibly recalled that prior to the attack around 1:00 a.m. on August 17, 2011, he and [appellant] had been involved in a volatile paramour relationship. They had been continually arguing because [Jesse] Hicks threatened to stop his financial support of [appellant] and members of her family. He had become resentful of [appellant's] increasing contact and texting of other men throughout the night. Mr. Hicks recalled that he told [appellant] that he was tired of arguing and that he was going to bed. [Appellant] continued to communicate on the cellular telephone and yelled out to him that he was going "to get it."

[Jesse] Hicks testified that a few minutes after he went to his bedroom, [appellant] yelled up to him that his friend Henry Houston, also known as Tupac, was at the apartment door. Mr. Hicks testified that he had been confused because Henry Houston had also been at the house that day, but he left earlier in the night well before any disputes arose with [appellant]. Because [appellant] insisted that he had a friend at the door, [Jesse] Hicks went to the living room to see who was knocking.

When Mr. Hicks entered the living room, he immediately noticed that the front door to his apartment was widely opened. He testified that this was odd to him because he had constantly kept a deadlock bolt on the front door. The only method for anyone to gain access, was for someone on the inside of the apartment to unlock the deadbolt and open the door. He deduced that [appellant] was the only person who could have successfully unlocked the deadbolt and opened the door. [Appellant] at a later point in the trial corroborated this data when she admitted both in her statement to the Detective and during her testimony that she had permitted the perpetrators to enter [Mr.] Hicks's apartment by unlocking and opening the front door.

At the same time he noticed the open door, [Jesse] Hicks turned to see two men standing with [appellant] in his kitchen. When he saw one [of] the two males carrying a gun in his hand, he ran to his bedroom with this gunman in fresh pursuit. As Mr. Hicks attempted to shut his bedroom door, it split open and the second male without an observable gun forcefully entered his room followed by the gunman. Mr. Hicks stated this unarmed man began to ransack his furniture room and closet, and repeatedly demanded for him to tell him where he had his money stashed.

Mr. Hicks testified that the gunman also assisted the other male in ransacking his apartment and harming him. He stated that after apparently not locating enough money, the gunman shot him directly into his mouth in his bedroom and hit him repeatedly. Mr. Hicks further testified that as this was occurring[, appellant] directed the assailants to check [Jesse's] pockets. Mr. Hicks noticed that throughout this attack his girlfriend simply stood by acting as if a shooting did not occur. He later overheard [appellant] try to convince the frightened neighbors in the downstairs apartment to tell responding police that she had not been present for the robbery and shooting.

Mr. Hicks distinctly recalled that [appellant] was the only person he had informed that he had been keeping large amounts of cash that night. Mr. Hicks testified that shortly before the robbery, he and [appellant] had spoken about her father's financial misfortune and that Mr. Hicks had roughly $700.00 in cash in his apartment intended for [appellant's] father.

[Mr. Hicks] vividly recollected that while he was being brutally beaten by both males, [appellant] told them that the money was in his pocket. The men not only took the money from his pockets, they removed and [sic] the pair of pants Mr. Hicks had been wearing to humiliate him. Mr. Hicks also stated that when he had later questioned [appellant] as to why she helped the men rob him, [appellant] claimed she had let the two males into the apartment because they threatened to hurt her son, and had hurt her neck. She admitted to telling at least one of the assailants that [Jesse] Hicks was home in the apartment with her and had a large amount of cash.

During the earlier morning hours following the shooting and robbery of [Jesse] Hicks, Police Detective John Cawley of the Special Investigations Unit of the Northeast Detective Division was initially assigned to conduct the investigation. The next day, upon starting a new shift, Northeast Division Detectives Christopher [Casey] and Andrew Danks were assigned to assist this investigation. The Detectives observed the bloodied scene and recover[ed] a spent or fired cartridge shell from the bedroom where Mr. Hicks and [appellant] had reported he had been shot. Because Mr. Hicks had positively identified his girlfriend[, appellant], to the Detectives as a suspect in the shooting after he was transported to the hospital, Detective [Casey] attempted multiple times, without success to reach [appellant].

On August 19, 2011, [appellant] was taken into custody for questioning and gave a voluntary

statement to Detective [Casey], after full and fair **Miranda**[2] warnings had been provided and acknowledged as understood. At trial, the statement of [appellant] given by her on August 19, 2011 was introduced via testimony from Detective [Casey]. Detective [Casey] stated that [appellant] admitted that she had a previous or ongoing relationship with one of the persons who participated in the robbery and shooting of [Jesse] Hicks. She claimed she knew this person as "Kwamaine" and that this person was one of [the] persons [Jesse] Hicks had been upset with her for communicating with him. [Appellant] told the Detective that she had told Kwamaine that Mr. Hicks had money because she had told him that [Jesse] had been buying things for her. She admitted that she knew Kwamaine and the other male intended to rob Mr. Hicks and harbored ill and jealous feelings toward him. She further stated to the Detectives that Kwamaine had texted her multiple times that night of the robbery before he had knocked at [Jesse's] apartment door claiming to be Henry Houston.

[Appellant] stated that she had not observed Henry Houston, or Tupac, at the door. She reiterated to Detectives that she knew what was going to happen when she permitted the entry of Kwamaine and the other man into Mr. Hicks'[s] apartment. When they entered she claimed to know that Kwamaine and the other male were there to rob Mr. Hicks. [Appellant] told Detectives that she heard two gunshots and the beating by both males of Mr. Hicks in his bedroom as she remained in the apartment. She also stated that she believed Kwamaine wanted to rob Mr. Hicks because he was jealous of Mr. Hicks'[s] relationship with her, and because Mr. Hicks was flashy with his money.

At trial, [appellant] incredibly testified particularly when confronted with her material misstatements. Her version of events was contradicted by the recorded prison telephone calls

---

[2] **Miranda v. Arizona**, 382 U.S. 925 (1965).

from prison when she desperately and repeatedly attempted to enlist at least one other person to do something to the victim to prevent his appearance against her in court. One of the recorded conversations played before the jury from call date of August 27, 2011 highlighted [appellant's] state of mind in her comments in response to the person identified as "Male Speaker:"

> [Appellant]: If Jesse doesn't show up they'll lower my bail anyways, right?
>
> Male speaker: Yeah they're supposed to, they're supposed to freaking . . . if Jesse don't show up they ain't got no case.
>
> [Appellant]: That's what I'm saying. I'm fucking sitting her[e] praying to God, like you need to make something happen to him.
>
> Male Speaker: I was gonna do something last night. I was supposed to go do something last night.

Trial court opinion, 6/13/17 at 5-11 (citations to notes of testimony and trial exhibit omitted; ellipses in original).

The record reflects that following her conviction, the trial court imposed a sentence of 20 to 50 years of imprisonment. The trial court summarized the remaining procedural history as follows:

> On June 24, 2015, this Court entered an Order Granting this Court's **sua sponte** Motion for Reconsideration of Sentence, and amended the previously [sic] Order and Judgement of Sentence. This Court significantly reduced the previously imposed aggregate sentence to state supervised confinement for a minimum period of 13 years to a maximum period of 30 years by directing the sentence imposed for the First Degree Felony

Robbery charge to run concurrently rather than consecutively to sentence imposed for the Attempted Murder offense. All other aspects of the previously imposed sentence remained the same.

On July 20, 2015, [appellant], by and through her original trial counsel, Reginald Johnson, Esquire filed a timely Notice of Appeal . . . . Gary S. Silver, Esquire entered his appearance as privately retained appellate counsel on behalf of [appellant]. On November 11, 2015, this Court ordered [appellant], by and through her counsel, Gary S. Silver, Esquire to file a concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). [Appellant], by and through counsel, failed to file a Rule 1925(b) statement. On January 20, 2016, this Court filed an amended Order directing [appellant] to file a Statement of Matters Complained of on Appeal within 21 days. [Appellant], by and through her counsel, again, failed to file any statement of errors. On February 12, 2016, this Court filed a second amended Order directing Gary Silver, Esquire as appellate counsel for [appellant] to file a statement of errors no later than April 1, 2016.

This Court granted a motion for extension to file the Rule 1925(b) statement on April 13, 2016, and directed counsel to file within 30 days. Defense counsel again failed to comply, and this Court filed a Rule 1925(a) opinion noting the numerous failures to file a statement of errors and the lack of merit for any issues [appellant] may raise.

On August 22, 2016, the Superior Court of Pennsylvania dismissed [appellant's] appeal due to the failure of appellate counsel to file a brief. On September 16, 2016, the Superior Court of Pennsylvania reinstated [appellant's] direct appeal. On October 16, 2016, the counsel for [appellant] filed a 1925(b) statement, and on April 17, 2017, the Superior Court of Pennsylvania entered an Order remanding the matter due to *per se* ineffective[ness] of appellate counsel's dilatory conduct and directing this Court to file an opinion

> addressing the seven issues raised by [appellant] within the belatedly filed Statement of Matters Complained of on Appeal.

Trial court opinion, 6/13/17 at 3-4. On June 13, 2017, the trial court filed its

Rule 1925(a) opinion.

Appellant raises the following issues for our review:

> I. WAS THE EVIDENCE INSUFFICIENT AS A MATTER OF LAW TO SUPPORT [APPELLANT'S] CONVICTION FOR ATTEMPTED MURDER BECAUSE THE COMMONWEALTH FAILED TO PROVE, UNDER AN ACCOMPLICE LIABILITY THEORY, THAT [APPELLANT] HARBORED THE SHARED AND SPECIFIC INTENT TO KILL JESSE HICKS DURING THE COURSE OF THE ROBBERY?
>
> II. WAS THE EVIDENCE WAS [SIC] INSUFFICIENT AS A MATTER OF LAW TO SUPPORT [APPELLANT'S] CONVICTIONS FOR THE POSSESSORY OFFENSES OF CARRYING A FIREARM WITHOUT A LICENSE, CARRYING A FIREARM IN PUBLIC AND POSSESSION OF AN INSTRUMENT OF CRIME BECAUSE THE COMMONWEALTH FAILED TO PROVE, UNDER AN ACCOMPLICE LIABILITY THEORY, THAT [APPELLANT] HARBORED THE SHARED INTENT TO COMMIT AN ARMED ROBBERY, AS OPPOSED TO AN UNARMED ROBBERY?
>
> III. WAS THE EVIDENCE WAS [SIC] INSUFFICIENT AS A MATTER OF LAW TO SUPPORT [APPELLANT'S] CONVICTION FOR CARRYING A FIREARM WITHOUT A LICENSE BECAUSE THE COMMONWEALTH FAILED TO PROVE THAT THE MAN WHO ACTUALLY POSSESSED THE HANDGUN, AS OPPOSED TO [APPELLANT] WHO NEVER ACTUALLY OR CONSTRUCTIVELY POSSESSED THE HANDGUN, DID NOT HAVE A LICENSE TO CARRY A FIREARM ON THE DATE OF THE INCIDENT?

IV. DID TRIAL COURT ERRED [SIC] IN PERMITTING DETECTIVE CHRISTOPHER CASEY, OVER THE DEFENSE OBJECTION, TO COMMENT ON [APPELLANT'S] CREDIBILITY, GUILT AND INVOLVEMENT IN THE CRIMES CHARGED?

V. DID THE TRIAL COURT ERRED [SIC] WHEN INSTRUCTING THE JURY THAT [APPELLANT], AS AN ACCOMPLICE, COULD NOT BE RESPONSIBLE FOR A CRIME IF SHE ATTEMPTS TO STOP THE CRIMES FROM HAPPENING, WHERE THE TRIAL COURT FAILED TO ALSO INSTRUCT THE JURY ON THE CLOSELY RELATED LEGAL PRINCIPLE THAT SHE CANNOT BE HELD CRIMINALLY LIABLE FOR THE ACTS OF ANOTHER IF SHE WAS SIMPLY PRESENT AT THE SCENE OF THE CRIME AND FAILED TO STOP THE CRIMES FROM OCCURRING; TRIAL COUNSEL SHOULD HAVE OBJECTED?

VI. DID THE TRIAL COURT ERRED [SIC] IN INSTRUCTING THE JURY ON THE CHARGE OF ATTEMPTED MURDER UNDER BOTH A CONSPIRACY LIABILITY THEORY AND AN ACCOMPLICE LIABILITY THEORY WHERE CONSPIRACY TO COMMIT ATTEMPTED MURDER IS NOT A LEGALLY COGNIZABLE CRIME; TRIAL COUNSEL SHOULD HAVE OBJECTED?

VII. DID THE TRIAL COURT ERRED [SIC] IN APPLYING OR CONSIDERING THE DEADLY WEAPON ENHANCEMENT WHEN SENTENCING [APPELLANT] ON THE CHARGES OF ATTEMPTED MURDER AND CONSPIRACY BECAUSE THE HANDGUN WAS NEVER POSSESSED BY [APPELLANT] OR WITHIN HER IMMEDIATE CONTROL DURING THE COMMISSION OF THE CRIMES?

Appellant's brief at 4 (capitalization in original).

Appellant frames her first three issues as challenges to the sufficiency of the evidence. In her first challenge, however, appellant contends that "the evidence was insufficient to support a finding beyond a reasonable doubt that she shared the specific intent to kill [the victim] to support her conviction for attempted murder **despite everything the victim and others said**." (Appellant's brief at 19 (emphasis added).) Appellant then sets forth her interpretation of certain portions of the trial evidence in an effort to convince this court to reach a different conclusion than the jury reached. In so doing, appellant challenges the weight of the evidence, not its sufficiency. **See**, **e.g.**, **Commonwealth v. Gibbs**, 981 A.2d 274, 281-282 (Pa.Super. 2008) (an argument that the fact-finder should have credited one witness' testimony over that of another witness goes to the weight of the evidence, not the sufficiency of the evidence); **Commonwealth v. Wilson**, 825 A.2d 710, 713-714 (Pa.Super. 2003) (a review of the sufficiency of the evidence does not include a credibility assessment; such a claim goes to the weight of the evidence); **Commonwealth v. Gaskins**, 692 A.2d 224, 227 (Pa.Super. 1997) (the fact-finder makes credibility determinations, and challenges to those determinations go to the weight of the evidence, not the sufficiency of the evidence).

In order to raise a weight claim on appeal, Pennsylvania Rule of Criminal Procedure 607 requires appellant to raise the claim with the trial

judge in a motion for a new trial "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A). "The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." Pa.R.Crim.P. 607, comment.

Our review of the certified record reveals that appellant failed to raise this weight claim with the trial court in a motion for a new trial orally, on the record, prior to sentencing; by written motion prior to sentencing; or in a post-sentence motion. Accordingly, appellant waives this weight challenge on appeal.

In her second issue, appellant presents the following two-sentence argument:

> In the present case, the evidence was insufficient to support the conclusions that [appellant] even knew her assailants would be armed before entering the house that night or otherwise assisted them in obtaining possession of the firearm used that night.
>
> For the foregoing reasons, [appellant's] convictions for all of the possessory offenses relating to the handgun in this case should be reversed.

Appellant's brief at 24-25.

Appellant waives this issue on appeal for failure to develop a legal argument. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (reiterating that "where an appellate brief fails to provide any

discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived"); citing to *Commonwealth v. Walter*, 966 A.2d 560, 566 (Pa. 2009); *Commonwealth v. Steele*, 961 A.2d 786, 799 n.12 (Pa. 2008); *Commonwealth v. Puksar*, 951 A.2d 267, 293-294 (Pa. 2008). *See also* Pa.R.A.P. 2119(a) (requiring that each point treated in an argument must be "followed by such discussion and citation of authorities as are deemed pertinent"). Moreover, our supreme court has long held that it is not the court's obligation to formulate an appellant's arguments. *See Commonwealth v. Wright*, 961 A.2d 119, 135 (Pa. 2008); *Commonwealth v. Thomas*, 717 A.2d 468, 482-483 (Pa. 1998).

In her final sufficiency challenge, appellant contends that the evidence was insufficient to convict her of carrying a firearm without a license because, "[d]espite the unlikelihood that the [shooter] had a license," the Commonwealth failed to prove that the unidentified shooter did not have a license to carry a firearm. (Appellant's brief at 26.)

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder

unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Pappas***, 845 A.2d 829, 835-836 (Pa.Super. 2004) (citation omitted).

At the outset, we note that the record supports the conclusion that the jury convicted appellant of possessing an instrument of crime ("PIC") under a constructive possession theory of criminal liability. (***See*** notes of testimony, jury charge, 3/2/15 at 87.) A person commits PIC "if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a).

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control." To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Commonwealth v. Walker*, 874 A.2d 667, 667-668 (Pa.Super. 2005) (citations omitted).

Here, the record reflects that appellant let the unidentified shooter and another unidentified man into the victim's apartment. The victim testified that when he saw this unidentified assailant holding a black gun, which the victim believed to be a Glock pistol, the victim ran upstairs. The other man followed, forced his way into the victim's bedroom, and began ransacking the victim's closet and demanding to know where the victim had placed his money. (Notes of testimony, 3/10/15 at 24-27.) When that man found no money, he instructed the unidentified shooter to shoot the victim. The unidentified shooter complied and shot the victim in the face, knocking his teeth out. As the victim lay on the floor, the two men stomped on the victim's face while the victim's blood shot up to the ceiling and he choked on his own teeth. (*Id.* at 27-30, 36.) Appellant then told her cohorts that the victim's money was in his pants pocket. The men removed the victim's pants, leaving him naked from the waist down, and fled with his money. (*Id.* at 30-31.)

Under the totality of the circumstance, this evidence established that appellant had the power to control the firearm and the intent to exercise that control and, therefore, constructively possessed the firearm. Consequently, the evidence was sufficient to sustain appellant's PIC conviction because, viewed in the light most favorable to the Commonwealth

as verdict winner, it enabled the jury to find that appellant constructively possessed an instrument of crime -- a firearm -- with intent to employ it criminally beyond a reasonable doubt.

With respect to her conviction for carrying an unlicensed firearm in violation of Section 6106(a), because the totality of the circumstances established that appellant constructively possessed the firearm and because the parties stipulated at trial that appellant did not have a license to possess a firearm (notes of testimony, 3/11/15 at 63-64.), this evidence, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the jury to conclude that appellant carried an unlicensed firearm.[3] Therefore, appellant's sufficiency challenge fails.

---

[3] We note that in her brief, appellant baldly asserts that the jury convicted her of carrying an unlicensed firearm based on an accomplice liability theory, which would require proof of licensure of her unidentified cohort. (Appellant's brief at 26). In its opinion, the trial court disposed of appellant's sufficiency challenge to this conviction because the "facts amply make out that she constructively possessed the weapon because she exercised conscious dominion and the power to control the firearm and the intent to exercise that control." (Trial court opinion, 6/13/17 at 16.) Notwithstanding this conclusion, the trial court addressed appellant's contention that this conviction was based on an accomplice liability theory and "[d]espite the unlikelihood that the other man had a license, the Commonwealth needed to prove it to make out this particular crime." (Appellant's brief at 26.) Although we disagree with the trial court's analysis with respect to appellant's accomplice liability argument on this issue, the fact remains that because the totality of the circumstances established constructive possession and the evidence was sufficient to sustain her PIC conviction, the evidence was also sufficient to convict appellant of carrying an unlicensed firearm because she constructively possessed that firearm and the parties stipulated that she was not licensed to carry a firearm. A review of the trial court's charge to the jury clarifies the point. (*See* notes of testimony, 3/2/15 at 88-89.)

Appellant next complains that the trial court erred when it permitted Detective Christopher Casey, "over defense objection, to comment on [appellant's] credibility, guilt and involvement in the crimes charged." (Appellant's brief at 26.) The record belies appellant's claim. In her brief, appellant sets forth two questions that the prosecution asked Detective Casey on redirect examination. (Appellant's brief at 27.) Appellant, however, fails to set forth the specific objection defense counsel made, as well as the fact that Detective Casey was merely reviewing, at the prosecution's request, the statement appellant made to law enforcement. The record clearly indicates that trial counsel did not object to the detective's making a "comment on [appellant's] credibility, guilt and involvement in the crimes charged," and that the detective made no such comment, as follows:

> Q. Going to C-37, her statement, I'd like to walk you through all the different things she said that led you to document in your 75-52, [appellant] admits her role in the robbery shooting, because defense counsel asked you about that.
>
> Let's start with page 1. Read it quietly to yourself. You're the detective, the one doing the interview. Let us know what, if anything she said that indicated she was involved in this.
>
> [DEFENSE COUNSEL]: Your Honor, I'm going to object. It's asked and answered.
>
> THE COURT: Overruled. Go ahead.

Notes of testimony, 3/1/15 at 49. The detective then testified as to the contents of the statement that appellant had made to law enforcement, without further objection from defense counsel. Therefore, because the record belies appellant's claim, it necessarily fails.

Appellant's next two complaints concern the jury instructions. Although appellant concedes that trial counsel failed to object to the jury instructions, she nevertheless contends that "the trial court erred when instructing the jury that [appellant], as an accomplice, could not be responsible for a crime if she attempts to stop the crimes from happening, where the trial court failed to also instruct the jury on the closely related legal principle that she cannot be held criminally liable for the acts of another if she was simply present at the scene of the crime and failed to stop the crimes from occurring" and "the trial court erred in instructing the jury on the charge of attempted murder under both a conspiracy theory and accomplice liability theory." (Appellant's brief at 28, 31.)

Where, as here, a defendant fails to request an instruction at trial and makes no objection to the trial court's jury charge, defendant waives the claim on appeal. *See Commonwealth v. Walter*, 119 A.3d 255, (Pa. 2015); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); Pa.R.A.P. 302(b) (With respect to the jury charge, "[a] general exception to the charge to the jury will not preserve an issue for appeal[; rather, a] [s]pecific objection

shall be taken to the language or omission complained of"); Pa.R.A.P. 647(C) ("[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"). Therefore, appellant waives her fifth and sixth issues on appeal.[4]

Appellant finally complains that the "trial court erred in applying or considering the deadly weapon enhancement." (Appellant's brief at 32.) We need not consider whether appellant satisfies the four-part test required to invoke our jurisdiction to entertain a challenge to a discretionary aspect of

---

[4] We note that appellant invites us to determine whether trial counsel was ineffective for failing to object to the jury instructions pursuant to **Commonwealth v. Holmes**, 79 A.3d 562 (Pa. 2013) (recognizing two exceptions to the general rule of deferral of ineffectiveness claims to collateral review that both fall within the trial court's discretion, which are (1) extraordinary circumstances where a discrete claim or claims of trial counsel's ineffectiveness is apparent on the record and meritorious to the extent that consideration on direct appeal best serves the interests of justice; and (2) where a defendant seeks to litigate multiple ineffectiveness claims, including non-record based claims, on post-verdict motions and direct appeal where defendant shows good cause and where unitary review is preceded by defendant's knowing and express waiver of entitlement to seek Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541-9546, review from conviction and sentence, including an express recognition that waiver subjects further collateral review to the time and serial PCRA restrictions). Because appellant's request falls far short of falling under either of the exceptions set forth in **Holmes**, we decline appellant's invitation to entertain her ineffective assistance of counsel claims on direct review.

appellant's sentence[5] because the record reflects that the trial court did not apply the deadly weapon enhancement, as follows:

> [THE COMMONWEALTH]: And I would just ask the Court to put on the record – I know Your Honor obviously read my memorandum – but that you consider the offense gravity score and prior record score for each offense, and that the deadly weapon used if – a ruling whether or not you applied that for the attempted murder.
>
> THE COURT: I ruled 8 to 20 applied the guidelines. Both 8 to 20 is within reach of your deadly weapon enhancements. It's obviously within that. But also with the -- without the deadly weapon enhancement, it's --
>
> [DEFENSE COUNSEL]: It's still within those guidelines.
>
> THE COURT: It's still within the guidelines.
>
> [THE COMMONWEALTH]: It is, Your Honor. I just want to make a clean record so there's, you know, there's no --
>
> THE COURT: All right. I didn't have to use the deadly weapon enhancement. . . .

Notes of testimony, 6/2/15 at 32-33. We need not determine, as the trial court did, whether mere consideration of the deadly weapon enhancement

---

[5] An appellant challenging the discretionary aspects of sentencing is not entitled to appellate review as of right, but must invoke this court's jurisdiction by satisfying a four-part test that demonstrates appellant filed a timely notice of appeal, properly preserved the issue with the trial court, included a Pa.R.A.P. 2119(f) statement in appellant's brief, and raised a substantial question. *Commonwealth v. Moury*, 992 A.2d 160, 170 (Pa.Super. 2010).

was error because the sentencing transcript clearly demonstrates that the trial court did not apply the enhancement.

Judgment of sentence affirmed.


Dubow, J. joins this Memorandum.

Bowes, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/30/2018