J-A11019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| COREY BRANDON PHILLIPS | : | |
| | : | |
| Appellant | : | No. 171 WDA 2020 |

Appeal from the Judgment of Sentence Entered September 10, 2019
In the Court of Common Pleas of Lawrence County
Criminal Division at No(s):  CP-37-CR-0000246-2015

BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY KING, J.:                    **FILED: September 8, 2021**

Appellant, Corey Brandon Phillips, appeals from the judgment of sentence entered in the Lawrence County Court of Common Pleas, following his jury trial conviction for first-degree murder.[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> On October 2, 2014, Patrolman Nathaniel Miller of the New Castle Police Department was contacted by Regina Washington, mother of Jahmia Ward, who reported Mr. Ward was missing since 1:00 a.m. that day.  Mr. Ward's name was placed in the NCIC database as a missing person. Subsequently, the report was provided to the New Castle Police Department Detective Bureau.  On October 3, 2014, Special Agent Aaron Vitale, currently employed by the Office of the Attorney General and previously employed as a detective for the New Castle Police Department, received the missing person report and performed a follow-up

---

[1] 18 Pa.C.S.A. § 2502(a).

investigation. During that investigation, Special Agent Vitale spoke with Mr. Ward's girlfriend, Jacqueline Koziol, who informed him Mr. Ward was last seen with [Appellant].

While Mr. Ward was unaccounted for, [Appellant] made several statements on Facebook indicating he did not know Mr. Ward's location. In a conversation with Lakiese Battles, Mr. Ward's cousin, [Appellant] informed Ms. Battles [that] Mr. Ward "was hittin the cut when I went to sleep for work," which [Appellant] explained means "laying low" to hide or get away. [Appellant] then expressed his concerns relating to Mr. Ward's whereabouts to Ms. Battles. [Appellant] also replied to Mr. Ward's Facebook account, which was being operated by Ms. Koziol at the time, "Many prayers! Bring my bro home, we was just chillin [man]!!!" [Appellant] responded to India Shardae Potter on Facebook after she asked about Mr. Ward's whereabouts, "Yeah we were together then he was supposed to leave for home but his [girlfriend's] Fam said he never came home" and "I haven't heard anything except we are [trying to] get a search team together." He then proceeded to state, "Yeah I feel [you]. Just hope he's [aright]. Everybody's sick and they are all [looking] at me like I'm involved with him disappearing [because] I was the last to see him. Idk [though]…"

On October 5, 2014, Special Agent Vitale was contacted by Police Chief Robert Salem who stated the police were obtaining a safe place for [Appellant] due to threats issued by the family and friends of Mr. Ward. The next day, [Appellant] was transported to the New Castle Police Station and was interviewed by Special Agent Vitale and Detective Brian Cuscino, which was recorded. [Appellant] explained he was with Mr. Ward on the previous Wednesday and Thursday. According to [Appellant], he and Mr. Ward intended to break into cars on the North Hill of New Castle, Lawrence County, Pennsylvania, after smoking marijuana on the East Side. As they were breaking into vehicles on the North Hill, they saw police officers, which prompted them to flee. [Appellant] said he ran home and he assumed Mr. Ward did the same. According to [Appellant], Mr. Ward stated he was going to "lay low" for a while because people were getting in trouble. [Appellant] informed the police officers he did not know where Mr. Ward was located, but feared something happened to him.

On October 8, 2014, Lawrence Emergency Operations Center (hereinafter "LEOC") received a call from Brittany Hemer, who stated she discovered bloody clothes in her trash. Special Agent Vitale and Lieutenant Kevin Seelbaugh proceeded to the residence located at 537 East Washington Street, Apt. 1, New Castle, Lawrence County, Pennsylvania, and seized the clothes, which were identified as having been worn by [Appellant] on the night Mr. Ward went missing.

Holly Slagle, a friend of [Appellant], was interviewed by Detective Cuscino and Lieutenant Seelbaugh on October 8, 2014. She indicated, on either October 3, 2014 or October 4, 2014, she was at Ms. Hemer's residence when [Appellant] brought her into the bathroom so they could converse. [Appellant] explained to Ms. Slagle that he killed Mr. Ward by accident while they were walking down "the cut," which is a heavily wooded area on the lower North Hill and concludes near the New Castle Police Station. According to [Appellant]'s conversation with Ms. Slagle, Mr. Ward stated "the cut" would be an easy place to kill someone and get away with it while he was holding a knife in his hand. A struggle for the knife ensued and they rolled down the hill resulting in Mr. Ward being stabbed. Ms. Slagle informed the police officers [Appellant] requested her assistance in disposing of the body, but she refused. Ms. Slagle stated [Appellant] threatened to kill her if she told anyone about their conversation.

Ms. Slagle also explained [Appellant] asked her to take him to obtain bleach to conceal his involvement in the homicide, but she refused. She further stated [Appellant] obtained a mattock from her father's shed and placed it in the trunk of her vehicle to dismember the body to prevent it from being identified. On October 9, 2014, Ms. Slagle informed police officers she saw Mr. Ward and [Appellant] on October 1, 2014, at Ms. Hemer's residence before she went to work and [Appellant] was in possession of a knife which was clipped to the outside of his pants in a leather sheath or "pouch" as she referred to it. Ms. Slagle explained to the police officers on October 14, 2014, she observed bite marks on [Appellant]'s arms during their conversation in Ms. Hemer's bathroom, which he stated were from Mr. Ward.

- 3 -

After receiving that information from Ms. Slagle, police officers searched for Mr. Ward's body in the area described by Ms. Slagle. Lieutenant Seelbaugh located the body in the wooded area near the intersection of North Street and Neshannock Avenue toward the bottom on "the cut." At the time it was discovered, Mr. Ward's body was concealed by vegetation and was in a state of decomposition.

On October 8, 2014, Lieutenant Seelbaugh with the assistance of Detective Cuscino interviewed [Appellant] for a second time, again which was recorded. [Appellant] explained he and Mr. Ward were breaking into vehicles on the North Hill around 1:30 or 2:00 a.m. on October 2, 2014, and, after they were finished breaking into the vehicles, they walked to "the cut" at approximately 4:30 a.m. They began arguing as it related to how the items stolen from the vehicles would be divided amongst them. [Appellant] stated Mr. Ward had a large hunting knife he removed from a leather sheath without saying anything and placed it back into the sheath. [Appellant] turned away from Mr. Ward and he heard the button open on the sheath. [Appellant] explained he turned around and Mr. Ward lunged at him with the knife. According to [Appellant], he punched Mr. Ward and they began wrestling for the knife. During the struggle, they fell down the hill, but [Appellant] could not recall how Mr. Ward got stabbed. After they reached the bottom of "the cut," [Appellant] held Mr. Ward in his arms, removed the leather sheath from Mr. Ward's person and covered his body with leaves. [Appellant] stated he left the area of "the cut" with the bags containing items removed from the vehicles on the North Hill and proceeded to walk to the East Side of New Castle utilizing an area known as "the dugout." [Appellant] returned to Ms. Hemer's residence, but she would not allow him to enter with the stolen items. At the conclusion of the interview, Lieutenant Seelbaugh documented [Appellant] suffered what appeared to be bite marks on his left arm, right wrist and the palm of his left hand. [Appellant] did not request medical assistance for those injuries. [Appellant] also explained he placed the mattock in the trunk of Ms. Slagle's vehicle to be used for cutting firewood for camping as they were planning to travel to Ms. Slagle's family's camp near Conneaut Lake. Ms. Slagle denied inviting [Appellant] to travel with her to her family's camp.

On May 1, 2015, the Commonwealth filed an Information which charged [Appellant] with Criminal Homicide and Aggravated Assault. [Appellant] filed an Omnibus Pre-Trial Motion on July 20, 2015, which consisted of a Motion to Suppress the statements he provided to police officers, a Motion for Writ of Habeas Corpus asserting the Commonwealth lacked sufficient evidence to establish a *prima facie* case for all the charges contained within the Information and a Motion to Disqualify Death Penalty. A hearing was held concerning [Appellant]'s Omnibus Pre-Trial Motion on December 2, 2015; however, additional time was necessary to complete the testimony and [Appellant] wished to file a supplemental pretrial motion. On December 9, 2015, [Appellant] filed a Supplemental Omnibus Pre-Trial Motion asserting all evidence derived from [Appellant]'s cell phone obtained during his initial interview with Special Agent Vitale on October 6, 2014, should be suppressed as it was illegally seized because [Appellant] was not under arrest at the time. The second hearing on [Appellant]'s Omnibus Pre-Trial Motion was held on February 12, 2016, and a further hearing was scheduled to allow the presentation of additional evidence related to [Appellant]'s Omnibus Pre-Trial Motion asserting [Appellant] had a right to have counsel present at the interview conducted by Lieutenant Seelbaugh as he was being detained by Lawrence County Adult Probation based upon a probation violation at the time he spoke with Lieutenant Seelbaugh on October 8, 2014. Two additional hearings were held concerning Appellant's Omnibus Pre-Trial Motion on July 5, 2016, and October 24, 2016. After the filing of a Brief in Support of Omnibus Pre-Trial Motion by [Appellant] on April 5, 2017, the [c]ourt issued an order of Court and Opinion on September 6, 2017, denying [Appellant]'s Omnibus Pre-Trial Motion, Supplemental Omnibus Pre-Trial Motion, and Second Supplemental Omnibus Pre-Trial Motion in their entirety.

Trial in the current case commenced on June 17, 2019, and, prior to the presentation of the instructions to the jury, [Appellant] requested he be provided with an instruction for heat of passion concerning the charge of Voluntary Manslaughter. That charge was opposed by the Commonwealth and the [trial c]ourt determined a heat of

- 5 -

passion charge was not appropriate based upon evidence presented at trial. The parties provided the jury with their closing arguments on June 21, 2019.

During his closing argument, the Senior Deputy Attorney General spoke very aggressively, which included several instances of yelling/shouting and involved numerous incidents of calling [Appellant] a liar, stating [Appellant] lied and referring to the defense as "ridiculous", "hoeey", "bologna", "cockamamie", "malarkey", and "fake news." At one point, the Commonwealth's closing included the following statement, "That's the anatomy of getting caught in a lie. Liars lie because they want to be believed. And Liars lie—in order to be believed, they always sprinkle a little bit of truth inside of their lies. And I suggest to you that that's exactly what this man did over and over and over and over again." The Senior Deputy Attorney General also presented a digital slideshow with his closing argument which contained pictures of cartoon characters [Pinocchio], Wile E. Coyote and a "Mr. Yuck" symbol. Moreover, the Senior Deputy Attorney General appeared to directly address [Appellant] by turning toward him and shouting, "Leave. Don't—don't stab, leave. Did you ever think about that? Did you ever think about that? Don't stab, leave." The Commonwealth's closing argument addressed opposing counsel in stating, "I almost couldn't believe what I was hearing out of Mr. Keith when Mr. Chalkboard Keith comes over here and says I want you to believe this and this but don't believe any of this."

[Following the Commonwealth's closing arguments, defense counsel moved for mistrial, stating:

> "During Attorney Schulte's argument, right toward the end when he was talking about the duty to retreat with respect to self-defense, he said something to the effect of the road was right there, why didn't he just run away; did he ever think about that. Then he turned to …[Appellant] and screamed the question at …[Appellant], looking directly at him, gesturing toward him, did you think about that? That is in effect an attempt to ask the question, …[Appellant] a question. That is not argument. That is a violation of …[Appellant]'s right to remain silent. That is a

- 6 -

violation of the constitutional right to take the witness stand. That is a violation of every rule of court that actually exists, to scream a question at …[Appellant] while turning and looking at him. It's completely inappropriate. I think you have to grant a mistrial and I think some of the attacks directly on counsel are inappropriate, too. I'd ask that you instruct the jury that that is inappropriate to attack counsel personally on matters."

(N.T. Trial, 6/21/19, at 67-68). The trial court denied Appellant's motion for mistrial. The court did, however, instruct the jury as follows: "[T]here's some reference in the closing argument where I believe Attorney Keith was referred to as Chalkboard Larry or something of that nature. Again, you're not to take that to prejudice against one side or the other or anything of that nature." (**Id.** at 72-72).]

Following the conclusion of trial, the jury returned a verdict of guilty on the charge of Murder of the First Degree and [Appellant] was sentenced on September 9, 2019, to a term of incarceration for the remainder of his natural life to be served in a State Correctional Institution. On September 13, 2019, [Appellant] filed timely Post-[Sentence] Motions consisting of a Motion for Judgment of Acquittal and a Motion for New Trial. The parties filed briefs on the issues raised by [Appellant] and oral argument was held on November 6, 2019.

(Trial Court Opinion, dated March 12, 2020, at 3-9) (internal footnotes omitted). On January 13, 2020, the trial court denied Appellant's post-sentence motions. Appellant timely filed a notice of appeal on February 3, 2020. On February 24, 2020, Appellant filed a voluntary Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Appellant raises eleven issues for our review:

1. The trial court erred as a matter of law when it denied [Appellant]'s motion for a mistrial based upon prosecutorial misconduct when the prosecutor engaged

- 7 -

in a closing argument rife with inappropriate characterizations, opinion and menacing behavior, all of which had the cumulative effect of inflaming the passions of the jury and prejudicing [Appellant] to such a degree as to deprive [Appellant] of a fair trial.

2. The trial court erred as a matter of law when it denied [Appellant]'s motion for a mistrial based upon prosecutorial misconduct when the prosecutor asked [Appellant] a question during the closing argument, impermissibly shifting the burden from the Commonwealth to [Appellant] causing prejudice to [Appellant].

3. The trial court erred as a matter of law when it denied [Appellant]'s motion for a mistrial based upon prosecutorial misconduct when the prosecutor yelled at and asked [Appellant] a question during the closing argument, violating [Appellant]'s constitutional right to remain silent and not testify and that such silence could not be held against him.

4. The trial court erred as a matter of law when it denied [Appellant]'s motion for a mistrial based upon the aforementioned prosecutorial misconduct and further failing to apply the double jeopardy clause of the Pennsylvania Constitution which prohibits re-trial of [Appellant] when those rights were subverted by the prosecutorial misconduct.

5. The trial court erred as a matter of law when it instructed the jury regarding surrendering the possession of a thing portion of the justification/self-defense instruction.

6. The trial court erred as a matter of law when it denied [Appellant]'s motion for a new trial when the [trial c]ourt erred by failing to include instruction to the jury regarding the heat of passion portion of the voluntary manslaughter instruction.

7. Did the trial court [err] as a matter of law when it denied [Appellant]'s motion for judgment of acquittal when the evidence presented was insufficient as a matter of law to demonstrate guilt beyond a reasonable doubt with

- 8 -

respect to the charge of murder in the first degree.

8. The trial court erred as a matter of law when it denied [Appellant]'s motion for a new trial when the verdict of guilt for the charge of murder in the first degree was against the weight of the evidence.

9. The trial court erred as a matter of law when it denied [Appellant]'s motion for a new trial when the verdict of the jury is against the weight of the evidence in finding that [Appellant] was not justified in the killing.

10. The trial court erred as a matter of law when it denied [Appellant]'s motion to suppress with respect to the statement of [Appellant] made following the illegal, unlawful and/or unconstitutional detention of [Appellant].

11. The trial court erred as a matter of law when it denied [Appellant]'s motion to suppress with respect to any and all evidence obtained during the course of and resulting from [Appellant]'s entire second interview as it violated [Appellant]'s Sixth Amendment absolute right to counsel.

(Appellant's Brief at 5-9) (some internal capitalization omitted).

In his first four issues combined, Appellant argues the trial court erred in denying his motion for a mistrial where the prosecution "deliberately conducted itself in an egregious manner during closing argument by yelling loudly for nearly the entire time, rendering opinion, calling defense counsel names and posing a question to [Appellant] directly knowing that …[Appellant] had chosen not to testify…." (*Id.* at 13). Specifically, Appellant avers the prosecution intended to "inflame the passions" of the jury in its closing statement where the prosecution, *inter alia*, repeatedly accused Appellant of lying, "utilized visual aids to enhance his tirade and mock [Appellant] and his

counsel," referred to defense counsel as "Chalkboard Keith," and called the defense's arguments "hooey, malarkey, cockamamie, bologna, and fake news." (***Id.*** at 16-24). In doing so, Appellant contends the prosecutor expressed his personal view of Appellant and impermissibly intruded on the jury's responsibility to evaluate Appellant's credibility.

Furthermore, Appellant asserts the questions the prosecution directed at Appellant during closing arguments violated his Fifth Amendment right against self-incrimination. Appellant argues the Commonwealth violated his right to remain silent when the prosecutor turned to Appellant and shouted, "Leave. Don't, don't stab, leave. Did you ever think about that? Did you ever think about that? Don't stab, leave." (***Id***. at 25-26) (quoting N.T. Trial, 6/21/19, at 65). Appellant claims it is illogical to believe that such behavior did not impermissibly influence the jury where the court itself noted its concern during the post-sentence motion hearing, stating: "What troubled the [c]ourt, Attorney Schulte, the [c]ourt recalls though you turning and looking at [Appellant]. It almost appeared to the [c]ourt that you were questioning [Appellant], looking for a response from him at that time." (Appellant's Brief at 26) (quoting N.T. Hearing, 11/6/19, at 11).

Appellant additionally asserts that the double jeopardy clause prohibits retrial in instances where intentional prosecutorial misconduct denied a defendant a fair trial. Appellant avers "the argument of the prosecutor was accompanied by planned visual aids and pictures that mocked and degraded

…[Appellant] and his counsel," which indicated that the prosecution attempted to deliberately prejudice Appellant. (Appellant's Brief at 28). Appellant concludes the prosecution's conduct during closing arguments was prejudicial to Appellant, and constituted grounds for mistrial. As well, Appellant maintains the prosecution's misconduct was intentional so double jeopardy applies, and Appellant cannot be retried. We disagree.

Appellate review of the denial of a motion for mistrial implicates the following principles:

> A motion for mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for mistrial. On appeal, our standard of review is whether the trial court abused that discretion.
>
> An abuse of discretion is more than an error in judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

**Commonwealth v. Tejeda**, 834 A.2d 619, 623 (Pa.Super. 2003) (internal citations and quotation marks omitted). **See also Commonwealth v. Melendez-Rodriguez**, 856 A.2d 1278, 1288 (Pa.Super. 2004) (*en banc*).

Pennsylvania Rule of Criminal Procedure 605 provides, in pertinent part:

**Rule 605.    Mistrial**

\* \* \*

- 11 -

(B)    When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial court may declare a mistrial only for reasons of manifest necessity.

\*    \*    \*

Pa.R.Crim.P. 605(B).  Pursuant to this rule, a motion for a mistrial is timely if it is "made when the alleged prejudicial event occurs." **Commonwealth v. Boring**, 684 A.2d 561, 568 (Pa.Super. 1996), *appeal denied*, 547 Pa. 723, 689 A.2d 230 (1997).  "When an event prejudicial to a defendant occurs at trial, he may either object, requesting curative instructions, or move for a mistrial."  **Id.** (emphasis added).  An allegedly prejudicial event at trial requires a prompt objection from the defense and a request for a mistrial to preserve the issue for appellate review. **Commonwealth v. Rhone**, 619 A.2d 1080 (Pa.Super. 1993), *appeal denied*, 534 Pa. 653, 627 A.2d 731 (1993).  If a defendant fails to move for a mistrial contemporaneously with the allegedly prejudicial incident at trial, "any potential claim is waived and the defendant is entitled to relief only if the trial judge finds a new trial to be a 'manifest necessity.'" **Commonwealth v. Montalvo**, 641 A.2d 1176, 1188 (Pa.Super. 1994).  "Reviewing courts use no mechanical formula in determining whether a trial court had a manifest need to declare a mistrial.  Rather, '…varying and often unique situations aris[e] during the course of a criminal trial…[and] the broad discretion reserved to the trial judge in such circumstances has been consistently reiterated….'" **Commonwealth v. Leister**, 712 A.2d 332, 335

(Pa.Super. 1998), *appeal denied*, 557 Pa. 627, 732 A.2d 613 (1998) (internal citations omitted).

Regarding prosecutorial misconduct, our standard of review is limited to "whether the trial court abused its discretion." ***Commonwealth v. Harris***, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>
> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [an appellant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

***Id.*** "In considering [an] appellant's claims of prosecutorial misconduct, we note that a prosecutor's comments do not constitute evidence." ***Commonwealth v. Baez***, 554 Pa. 66, 103, 720 A.2d 711, 729 (1998), *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999).

Generally, when the prosecution refers to a non-testifying defendant's silence as evidence of guilt, it violates the defendant's right against self-

incrimination. ***Commonwealth v. Molina***, 628 Pa. 465, 104 A.3d 430 (2014) (explaining prosecutor violated defendant's Fifth Amendment right against self-incrimination when he emphasized defendant's silence as "most telling," by asking why defendant refused to cooperate with detective, and then instructing jury to "[f]actor that in when you're making an important decision in this case as well"). Furthermore, "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." ***Commonwealth v. Smith***, 532 Pa. 177, 186, 615 A.2d 321, 325 (1992).

Instantly, Appellant raises numerous instances of prosecutorial misconduct on appeal, including "counsel for the Commonwealth utiliz[ing] the words lie, liars or lied with respect to …[Appellant] and/or the defense's case a total of twenty (20) times during the closing remarks[,] [using] the phrase fake news a total of four (4) times during the closing remarks and shout[ing] the word hooey five (5) times during closing remarks," as well as the prosecutor's use of "inappropriate visuals to emphasize his opinion." (Appellant's Brief at 18, 20). Nevertheless, in moving for a mistrial after the Commonwealth's closing argument, defense counsel objected only to the prosecutor's attempt to ask Appellant a question during its closing argument and the Commonwealth's "attacks directly on [defense] counsel." (***See*** N.T.

Trial, 6/21/2019, at 68).  As a result, these are the only two instances of prosecutorial misconduct Appellant properly preserved for appeal.  **See** Pa.R.Crim.P. 605(B); **Boring, supra**; **Rhone**, **supra**.  Any other prosecutorial misconduct claims raised on appeal are waived.  **See Montalvo**, **supra**.

Regarding Appellant's claim concerning "attacks directly on counsel," defense counsel requested, and the trial court issued, a curative instruction advising the jury to ignore the prosecutor's "Chalkboard Keith" comment. Significantly, defense counsel did not raise any further objections.  **See Commonwealth v. Page**, 965 A.2d 1212, 1222 (Pa.Super. 2009), *appeal denied*, 621 Pa. 665, 74 A.3d 125 (2013) (holding appellant waived challenge to prosecutor's allegedly improper comment where appellant initially objected, court issued curative instruction, but appellant subsequently failed to object to adequacy of court's curative instruction).  Additionally, we can presume the jury followed the court's curative instruction.  **See Commonwealth v. Housman**, 604 Pa. 596, 986 A.2d 822 (2009), *cert. denied*, 562 U.S. 881, 131 S.Ct. 199, 178 L.Ed.2d 120 (2010) (stating: "There is a presumption in the law that the jury followed the instructions given by the trial judge...").

Concerning the prosecutor's alleged questioning of Appellant during closing argument, the trial court reasoned:

> [T]here was no violation of [Appellant]'s right to remain silent in the current case.  …[I]t is clear to this [c]ourt the Senior Deputy Attorney General directly addressed [Appellant] by turning toward him and shouting, "Did you ever think about that?  Did you ever think about that?  Don't stab, leave."  [However, t]he prosecutor did not make any

- 15 -

direct reference to [Appellant]'s refusal to testify at trial and did not attempt to impute [Appellant]'s guilt based upon that refusal. While it is not appropriate to ask [Appellant] a question, even a rhetorical question, there is no indication the jury could have interpreted this as an attempt to establish [Appellant]'s guilt based upon his refusal to testify at trial as closing argument is not a forum conducive to questions and answers. In **Molina**[*, supra*], it was clear the prosecutor was encouraging the jury to infer the appellant's guilt from his pre-arrest silence [and so the appellant's right against self-incrimination was infringed]. In this case, the Senior Deputy Attorney General did not make any reference to [Appellant]'s silence nor did he implore the jury to use [Appellant]'s silence at trial as means of inferring guilt.

(Trial Court Opinion at 30-31). We agree with the trial court's analysis.

Here, we emphasize that the prosecutor did not make any comments or criticisms concerning Appellant's silence and refusal to testify. **Compare Molina, supra**. Therefore, the trial court did not abuse its discretion in denying Appellant's motion for a mistrial based on this claim of prosecutorial misconduct. **See Harris, supra**; **Tejeda, supra**. Because the court properly denied Appellant's motion for a mistrial, Appellant's double jeopardy claim necessarily fails. **See Smith, supra**. Thus, Appellant is not entitled to relief on his first four issues.

In his fifth and six issues, Appellant raises two arguments concerning jury instructions. First, Appellant asserts the trial court's instruction regarding "possession of a thing" misrepresented the evidence and confused the jury. Specifically, Appellant takes issue with the court's instruction that the jury could find Appellant was not justified in his use of deadly force against the

victim if "[Appellant] knew he could avoid the necessity of using deadly force with complete safety by …surrendering possession of a thing to a person asserting a claim of right to it and failing to do so." (Appellant's Brief at 30-31) (quoting N.T. Trial, 6/21/2019, at 103). Appellant insists there was no evidence indicating that Mr. Ward demanded possession of the items he and Appellant had stolen, or that Appellant had an opportunity to surrender any items before having to defend himself "against an attack with a deadly weapon." (Appellant's Brief at 31). Appellant further avers that the possessions in question were "gains from the result of criminal activities [that] the victim would have had no claim of right to…." (*Id.* at 32). Appellant maintains the issuance of this instruction prejudiced him, misled the jury, and denied him a fair trial.

Second, Appellant argues the trial court committed reversible error when it denied Appellant's request "to instruct the jury regarding the heat of passion portion of the voluntary manslaughter jury instruction." (*Id.* at 33). Appellant avers that to successfully argue "heat of passion," he had to show: (1) provocation by the victim, (2) Appellant was impassioned, and (3) Appellant did not have a sufficient cooling off period. Appellant asserts "there was clearly at least some evidence that …[Appellant] was acting under a sudden and intense passion resulting from serious provocation by the victim," where the victim attacked Appellant with a knife. (*Id.* at 35). Appellant further avers that "[s]uch a situation would prevent any reasonable man from

doing anything but reacting to the threat and danger to his person," and there was no indication that Appellant had "sufficient cooling off time between the provocation and the killing." (*Id.* at 36). Appellant concludes that the court's errors concerning these jury instructions requires a new trial. We disagree.

Our standard of review of a court's decision to include or omit jury instructions "is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Baker*, 24 A.3d 1006, 1022 (Pa.Super. 2011), *aff'd*, 621 Pa. 401, 78 A.3d 1044 (2013) (quoting *Commonwealth v. Galvin*, 603 Pa. 625, 651, 985 A.2d 783, 799 (2009), *cert. denied*, 559 U.S. 1051, 130 S.Ct. 2345, 176 L.Ed.2d 565 (2010)). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Commonwealth v. Hamilton*, 766 A.2d 874, 878 (Pa.Super. 2001).

> In evaluating jury instructions, we must read the charge as a whole to determine whether it was fair or prejudicial. *Commonwealth v. Murphy*, 559 Pa. 71, 739 A.2d 141, 146 (1999). "The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273, 1274 (1990). For appellant to be entitled to a new trial, the jury instruction must have been fundamentally in error, or misled or confused the jury. *Commonwealth v. Patosky*, …656 A.2d 499, 506 ([Pa.Super.] 1995)[, *appeal denied*, 542 Pa. 664, 668 A.2d 1128 (1995)].

*Commonwealth v. Wright*, 599 Pa. 270, 315, 961 A.2d 119, 145 (2008).

The Pennsylvania Standard Jury Instructions concerning rules for justifying the use of deadly force state, in pertinent part:

> (1) If the Commonwealth proves to you beyond a reasonable doubt that the defendant used deadly force, then to prove that such force was not justifiable in this case, it must prove one of the following elements beyond a reasonable doubt [*give only those supported by the record*]:
>
>     \*     \*     \*
>
> c. that the defendant knew that [he] [she] could avoid the necessity of using deadly force with complete safety by [*give only those supported by the record*]:
>
>     \*     \*     \*
>
> (2) surrendering possession of a thing to a person asserting a claim of right to it, and failing to do so[.]

Pa.S.S.J.I. (Criminal) § 9.501. Where the trial court's instructions follow the Pennsylvania Suggested Standard Criminal Jury Instructions, it is presumed that such instructions are an accurate statement of the law. ***Commonwealth v. Kerrigan***, 920 A.2d 190, 198 (Pa.Super. 2007), *appeal denied*, 594 Pa. 676, 932 A.2d 1286 (2007).

Furthermore, the Crimes Code defines voluntary manslaughter as:

> **§ 2503.  Voluntary Manslaughter**
>
> **(a) General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed[.]

18 Pa.C.S.A. § 2503(a)(1).  "[T]o prove voluntary manslaughter, there must

be 'sufficient cause of provocation and a state of rage or passion, without time to cool, placing the [defendant] beyond the control of his reason and impelling him to the deed.'" **Commonwealth v. Swaney**, 445 Pa 244, 246-48, 284 A.2d 732, 733 (1971) (quoting **Commonwealth v. Brown**, 436 Pa. 423, 427, 260 A.2d 742, 744 (1970)).

The Pennsylvania Supreme Court "has repeatedly held since 1982 that a murder defendant is entitled to a jury instruction on the lesser offense of voluntary manslaughter only where there is sufficient evidence to support such a verdict." **Commonwealth v. Cook**, 597 Pa. 572, 633, 952 A.2d 594, 636-37 (2008) (citing **Commonwealth v. Ragan**, 560 Pa. 106, 743 A.2d 390 (1999)).

> [U]nder Pennsylvania law, a homicide defendant is entitled to a jury instruction on voluntary manslaughter only "where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict." **Commonwealth v. Thomas**, 552 Pa. 621, 717 A.2d 468, 478 (1998)[, *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999)]. Voluntary manslaughter is an appropriate verdict for "heat of passion" killings, where, "at the time of the killing, [the defendant] acted under sudden and intense passion [due to] serious provocation by the victim." **Id.** at[ 640, A.2d at] 477. The test for provocation is "whether a reasonable [person] confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection." **Commonwealth v. Galloway**, …485 A.2d 776, 783 ([Pa.Super.] 1984).

**Commonwealth v. Kim**, 888 A.2d 847, 852-53 (Pa.Super. 2005), *appeal denied*, 587 Pa. 721, 899 A.2d 1122 (2006).

Instantly, the trial court explained its reasoning for giving the jury

instruction regarding "possession of a thing" as follows:

> The [c]ourt derived its instruction concerning justification/self-defense based upon the Pennsylvania Standard Jury Instructions 9.501….
>
> [Appellant], in his statement to Lieutenant Seelbaugh and Detective Cuscino, indicated he and Mr. Ward had an argument concerning the manner in which they intended to divide the items taken from the vehicles on the North Hill. It was at that time, according to [Appellant], Mr. Ward removed the large knife from the sheath and returned it to the sheath. [Appellant] turned toward Mr. Ward, who lunged at [Appellant] while brandishing the knife. According to [Appellant]'s own statement, the argument initially ensued based upon the division of the stolen items. Resultantly, if [Appellant] would have agreed with Mr. Ward's proposal to divide the items, it is likely the altercation would not have ensued. The Commonwealth presented sufficient evidence to permit the [c]ourt to properly provide the above-mentioned jury instruction and allow the jury to decide whether [Appellant] could have avoided using deadly force by surrendering the items to Mr. Ward. Thus, the [c]ourt did not err by instructing the jury concerning surrendering possession of a thing.

(Trial Court Opinion at 19-20).[2]

The trial court further explained its decision to deny Appellant's request

---

[2] The Commonwealth acknowledges on appeal that the "surrendering possession of a thing to a person asserting a claim of right thereto" language was removed from 18 Pa.C.S.A. § 505 (governing use of force in self-protection) as part of the revision of that statute which became effective on August 29, 2011. Nevertheless, the Commonwealth asserts that "[t]his amendment is in no way relevant to the outcome of this case because …Appellant has never claimed that the instruction given at trial misstated the law." (Commonwealth's Brief at 20 n.5). Rather, the Commonwealth points out that Appellant "instead claims that this charge was unwarranted under the facts of the case and thus caused undue confusion to the jury." (*Id.* at 20). We agree with the Commonwealth that Appellant is not entitled to relief on this issue on the grounds asserted.

for a "heat of passion" jury instruction as follows:

> [T]he evidence presented at trial did not provide grounds to allow the [c]ourt to provide the jury with a heat of passion instruction. First, [Appellant]'s own statement to police officers does not indicate he was acting in the heat of passion as he stated the killing occurred following a short argument relating to how the stolen items would be divided amongst them. According to [Appellant], Mr. Ward unsheathed a 10-inch knife and lunged towards him resulting in a physical altercation in which [Appellant] inflicted the fatal wounds to Mr. Ward. [Appellant] never indicated to police officers he was enraged with Mr. Ward or so impassioned by their argument he could not control himself and was compelled to stab Mr. Ward to death. In fact, [Appellant] explained his actions were undertaken in response to the aggression of Mr. Ward as opposed to being angered himself. Thus, the evidence presented at trial did not entitle [Appellant] to have the [c]ourt instruct the jury concerning the heat of passion portion of voluntary manslaughter.

(Trial Court Opinion at 19-20). We agree with the trial court's analysis in both instances.

Here, the Commonwealth presented sufficient evidence concerning Appellant's stabbing of the victim to allow for a jury instruction regarding "possession of a thing," where Appellant told officers that he and the victim had been fighting over stolen goods prior to the stabbing. ***See Wright, supra***. Additionally, the evidence did not support an instruction concerning "heat of passion," where Appellant told officers that he stabbed Mr. Ward in self-defense, not because he became impassioned over their argument. ***See Cook, supra***. Therefore, the trial court did not abuse its discretion in including a "possession of a thing" instruction or in denying Appellant's request

for a "heat of passion" instruction. **See Baker, supra**. As such, Appellant is not entitled to relief on his fifth and sixth issues.

In his seventh, eighth, and ninth issues combined, Appellant argues the evidence presented at trial does not support Appellant's conviction for first-degree murder. Specifically, Appellant contends the evidence was insufficient to show that Appellant had specific intent to kill or that he did so with the requisite malice. Appellant avers that "[w]hile the Commonwealth introduced evidence of [Appellant]'s actions and communications with others following the homicide, there was no evidence elicited at the time of trial from which a jury could find that [Appellant] had a fully formed intent to kill and was conscious of his own intention as required for a first-degree murder conviction." (Appellant's Brief at 39). Appellant additionally asserts that the Commonwealth failed to present evidence at trial "from which a jury could have found beyond a reasonable doubt that …Appellant was not justified in using deadly force against the victim." (**Id.** at 40).

Appellant further argues that the trial court erred in failing to find that the verdict was against the weight of the evidence presented. Appellant asserts that the only evidence the Commonwealth presented regarding specific intent or malice was Appellant's account of the incident, in which Appellant claimed the victim attacked him with a knife from behind. Appellant insists this account was not contradicted by any other evidence at trial. Appellant argues that his account of what happened is of greater weight than

any other evidence presented at trial and "to ignore the same or to give other evidence equal weight would be to deny justice." (*Id.* at 43). Appellant concludes that because there was insufficient evidence to support a conviction for first-degree murder, and because the verdict was against the weight of the evidence, this Court must grant him appropriate relief. We disagree.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hutchinson*, 947 A.2d 800, 805-06 (Pa.Super. 2008), *appeal denied*, 602 Pa. 663, 980 A.2d 606 (2009) (quoting *Commonwealth v. Andrulewicz*, 911 A.2d 162, 165 (Pa.Super. 2006), *appeal denied*, 592 Pa. 778, 926 A.2d 972 (2007)) (emphasis omitted). "A motion for judgment

of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge." **Hutchinson, supra** at 805.

Regarding a weight of the evidence claim:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the…verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> **Commonwealth v. Small**, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

**Commonwealth v. Champney**, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted).

The Crimes Code defines first-degree murder as follows:

**§ 2502.  Murder**

**(a) Murder of the first degree.—** A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

> To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he…unlawfully

killed a human being and did so in an intentional, deliberate and premeditated manner.

It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. …

The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

*Commonwealth v. Schoff*, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal citations omitted).  In addition, "the use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." *Thomas, supra* at 632, 717 A.2d at 474.

Instantly, the Commonwealth presented, *inter alia*, the following evidence: (1) Appellant's bloody clothing that had been found in Ms. Hemer's trash; (2) testimony from Ms. Slagle that she saw Appellant with a knife in a sheath on October 1, 2014, the day before the murder; (3) testimony from Ms. Slagle that Appellant confessed to her that he accidentally killed Mr. Ward; (4) testimony from Ms. Slagle that Appellant asked her to drive him to obtain bleach to pour on Mr. Ward's body, which she refused to do; (5) testimony from Ms. Slagle that Appellant took an axe from Ms. Slagle's father's residence to use to dismember Mr. Ward's body, although he did not ultimately use it for that purpose; (6) Appellant's interview with Lieutenant Seelbaugh on October 8, 2014, in which he admitted to accidentally killing Mr. Ward and leaving the body in "the cut"; and (7) the testimony of Deputy Coroner Richard Johnson who stated that Mr. Ward had multiple stab wounds to his abdomen

and defensive wounds to his palms.

Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Appellant committed first-degree murder. *See* 18 Pa.C.S.A. § 2502(a); *Hutchinson, supra*. Regarding Appellant's assertion that the Commonwealth failed to present evidence of his intent to kill Mr. Ward, Appellant's intent to kill "could be inferred from his use of a deadly weapon, the knife, to a vital portion of Mr. Ward's body, his abdomen." (Trial Court Opinion at 14). *See also Thomas, supra*. Thus, Appellant's sufficiency challenge merits no relief. For similar reasons, we will also not disturb the trial court's denial of Appellant's weight of the evidence challenge. *See Champney, supra*.

In his remaining issue, Appellant argues that the trial court erred when it denied Appellant's motion to suppress the evidence "obtained during the course of and resulting from the Appellant's entire second interview…."[3]

_____

[3] In his appellate brief, Appellant fails to present a separate argument section regarding issue ten. Rather, Appellant purports to combine issues ten and eleven in a single argument section. Nevertheless, Appellant fails to present any actual argument concerning issue ten. Specifically, Appellant fails to explain why he believes his detention was illegal and unconstitutional. Appellant's failure to adequately develop his argument concerning issue ten hampers our ability to review this issue and constitutes waiver on appeal. *See Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1262 (Pa.Super. 2014), *appeal denied*, 628 Pa. 627, 104 A.3d 1 (2014) (stating: "The Pennsylvania Rules of Appellate Procedure require that each question an appellant raises be supported by discussion and analysis of pertinent authority, and failure to do

*(Footnote Continued Next Page)*

(Appellant's Brief at 44). Specifically, Appellant avers that his Sixth Amendment right to counsel had "attached" when he was detained for violations of his probation and underwent *Gagnon I*[4] proceedings on October 8, 2014, prior to his interview with Lieutenant Seelbaugh concerning the instant allegations. Appellant asserts that "[a]s the allegations in the probation hearing were the exact same allegation[s] in the present case and as Appellant was in custody, Appellant had an absolute right to have counsel present at any questioning by the Commonwealth." (*Id.* at 47). Appellant concludes that the failure of the Commonwealth to ensure the presence of counsel at the interview violated his rights and, as a result, all evidence stemming from the second police interview should have been suppressed. We disagree.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111, 112 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom

_____

so constitutes waiver of the claim"). ***See also*** Pa.R.A.P. 2119(a) (stating argument section shall be divided into as many sections as there are questions presented, followed by discussion and citations to pertinent legal authorities).

[4] ***Gagnon v. Scarpelli***, 411 U.S. 778, 93 S.Ct. 1756, 36 L. Ed. 2d 656 (1973).

are in error.  [*Id.*]

***Commonwealth v. Eichinger***, 591 Pa. 1, 22, 915 A.2d 1122, 1134 (2007),

*cert. denied*, 552 U.S. 894, 128 S.Ct. 211, 169 L.Ed.2d 158 (2007).

"A criminal defendant's right to counsel is guaranteed by the Sixth

Amendment to the United States Constitution and Article I, Section 9 and

Article V, Section 9 of the Pennsylvania Constitution."  ***Commonwealth v.***

***Clyburn***, 42 A.3d 296, 298 (Pa.Super. 2012).

> [T]he United States Supreme Court has consistently held
> that the Sixth Amendment right to counsel does not attach
> until a prosecution is commenced, *i.e.*, until the initiation of
> adversary judicial criminal proceedings—whether by way of
> formal charge, preliminary hearing, indictment, information,
> or arraignment.
>
> Once attachment of the Sixth Amendment right to counsel
> has occurred, the accused at least is entitled to the presence
> of appointed counsel during any 'critical stage' of the post[-
> ]attachment proceedings.

***Commonwealth v. Padilla***, 622 Pa. 449, 474-75, 80 A.3d 1238, 1252-53

(2013), *cert. denied*, 573 U.S. 907, 134 S.Ct. 2725, 189 L.Ed.2d 769 (2014)

(internal citations and quotation marks omitted).  Significantly, "[t]he Sixth

Amendment right… is offense specific.  It cannot be invoked once for all future

prosecutions…."  ***McNeil v. Wisconsin***, 501 U.S. 171, 175, 11 S.Ct. 2204,

2207, 115 L.Ed.2d 158 (1991).

Instantly, the trial court addressed this issue as follows:

> [Appellant] argued the Second Interview which occurred on
> October 8, 2014, was conducted in violation of his Sixth
> Amendment right to counsel.  However, the second
> interview occurred one day prior to the filing of the criminal

complaint. As stated in [***Commonwealth v. McCoy***, 601 Pa. 540, 975 A.2d 586 (2009)], the filing of the criminal complaint is one of the typical attachment points for the Sixth Amendment right to counsel. [Appellant] argues in this case the Sixth Amendment right to counsel attached at the waiver of the ***Gagnon I*** proceeding prior to this interview and the filing of the criminal complaint. In favor of this view, Appellant pointed to the contents of the Petition to Revoke Probation. The United States Supreme Court has stated "a defendant's statements regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." ***Texas v. Cobb***, 532 U.S. 162, 168, 121 S. Ct. 1335, 1340, 149 L. Ed. 2d 321 (2001). There is no question the Sixth Amendment has already attached for the case in which …[Appellant]'s probation was revoked. The question before the [c]ourt is whether the ***Gagnon I*** proceeding can function as an attachment point for a separate case when the revocation is based on the factual circumstances of the later case.

[Appellant] directed the [c]ourt to ***In re Pack***, …616 A.2d 1006 ([Pa.Super.] 1992)[, *appeal denied*, 535 Pa. 669, 634 A.2d 1117 (1993)]. In ***Pack***, the Superior Court found the Sixth Amendment right to counsel attached to uncharged offenses when those offenses are related to the [factual] underpinnings of other, charged offenses. However, ***In Re Pack*** was specifically abrogated in regards to [Appellant]'s argument by the United States Supreme Court in [***Cobb, supra***] (Listing ***Pack*** as one of several cases which have improperly read into the Sixth Amendment a factual relation exception to the offense-specificity requirement).

The Supreme Court of Pennsylvania since ***Cobb*** has reaffirmed for the purposes of determining attachment, the Pennsylvania Constitution is coterminous with the Sixth Amendment. [***Commonwealth***] ***v. D'Amato***, 579 Pa. 490, 516 n.14, 856 A.2d 806, 821 n.14 (2004). The ongoing coterminous nature of Pennsylvania law adopts the United States Supreme Court's reasoning with regards to the Sixth Amendment. If the United States Supreme Court does not recognize ***Pack***'s justification under the Sixth Amendment, and the Pennsylvania Courts have not since diverged, then ***Cobb*** would apply to Pennsylvania-specific law.

The case of [**Commonwealth**] **v. Karash**, 513 Pa. 6, 14, 518 A.2d 537, 541 (1986), held Pennsylvania treats "arrest as the triggering event which causes the Sixth Amendment right to attach." However, both the facts of that case and subsequent decisions bar the [c]ourt from holding the detainer of the [d]efendant would initiate Sixth Amendment right to counsel attachment. In **Karash** as here, the defendant was in custody for separate reasons. Karash was a prisoner, and argues the "bring-up" procedures by which he was provided to the Luzerne County police for separate charges would trigger attachment of the Sixth Amendment right to counsel. The **Karash** Court held while the right to counsel attached at arrest, this interrogation while in custody for other charges did not constitute a "commitment to prosecute" under the new charges which would have triggered attachment. **Id.** at 541.

In the case before the [c]ourt, the same circumstances applied. The detention of [Appellant] based on the initiation of procedures to revoke probation does not constitute a commitment to prosecute under the charges which were eventually filed. Revocation proceedings do not indicate a commitment to prosecute the same activities as separate charges. Revocation of probation carries a significantly lower standard for the Commonwealth and does not constitute a critical stage of a proceeding.

Further, while **Karash** was never explicitly overruled, it has largely been treated as a narrow exception rather than the rule. In the 31 years since **Karash** was decided, it has only been cited in controlling appellate cases 17 times, and many of those citations were to distinguish **Karash** rather than to support it. In [**McCoy, supra**], the Pennsylvania Supreme Court addressed a party's citation to **Karash** for the proposition "the right to counsel in Pennsylvania is coterminous with the Sixth Amendment right, attaching at the time of arrest." [**Id.**] The Supreme Court responded to that argument stating the "the law is settled regarding when the Sixth Amendment right to counsel attaches; appellant's circumstances did not trigger this right because, although under arrest, no criminal complaint had been filed, and the adversarial judicial proceedings had yet to begin." **Id.** at 546. Based on the Supreme Court's statement in **McCoy**,

- 31 -

the proposition in **Karash** that the Sixth Amendment attaches at arrest appears to have been implicitly overruled. Based on the aforementioned reasons, [Appellant]'s Sixth Amendment right to counsel had not yet attached when he participated in the second interview with police officers.

Moreover, [Appellant] executed a **Miranda**[5] waiver prior to giving his video-taped statement in the second interview. "As a general matter, an accused who is admonished with the warning prescribed by this Court in **Miranda**, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."

(Trial Court Opinion at 25-29) (some internal citations omitted). We agree with the trial court's analysis.

Here, although Appellant was in custody for a probation violation based upon the instant offenses, he had not yet been charged for the instant offenses. **See McNeil, supra**. Thus, his Sixth Amendment right to counsel had yet to attach in this case. **See Padilla, supra**. Therefore, counsel's presence was not required at the second interview on October 8, 2014, and Appellant is due no relief. **Id.** Accordingly, we affirm.

Judgment of sentence affirmed.

---

[5] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/08/2021